*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| PLANNED PARENTHOOD OF THE GREAT NORTHWEST, JAN WHITEFIELD, M.D., and SUSAN LEMAGIE, M.D., <br><br> Appellants and Cross-Appellees, <br><br> v. <br><br> STATE OF ALASKA, LOREN LEMAN, MIA COSTELLO, and KIM HUMMER-MINNERY, <br><br> Appellees and Cross-Appellants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Supreme Court Nos. S-15010/15030/ 15039 (Consolidated)

Superior Court No. 3AN-10-12279 CI

O P I N I O N

No. 7114 – July 22, 2016

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances: Susan Orlansky, Feldman Orlansky & Sanders, and Thomas Stenson, ACLU of Alaska Foundation, Anchorage, Janet Crepps, Center for Reproductive Rights, Simpsonville, South Carolina, Talcott Camp and Andrew Beck, ACLU Foundation, and Diana O. Salgado, Planned Parenthood Federation of America, New York, New York, and Laura F. Einstein, Planned Parenthood of the Great Northwest, Seattle, Washington, for Appellants/Cross-Appellees. Margaret Paton Walsh and Dario Borghesan, Assistant Attorneys General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau for Appellee/Cross-Appellant State of Alaska. Kevin G. Clarkson and

Matthew C. Clarkson, Brena, Bell & Clarkson, P.C., Anchorage for Appellees/Cross-Appellants Loren Leman, Mia Costello, and Kim Hummer-Minnery.  Allison Mendel, Mendel & Associates, Inc., Anchorage, and Lourdes M. Rosado, Juvenile Law Center, Philadelphia, Pennsylvania, for Amici Curiae Juvenile Law Center, Legal Voice, and National Center for Youth Law.  Kimberly A. Parker and Joshua S. Press, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Amici Curiae American College of Obstetricians and Gynecologists, American Congress of Obstetricians and Gynecologists, National Association of Social Workers, Alaska Chapter, Society for Adolescent Health and Medicine, and American Psychiatric Association. Christina Passard, The Law Office of Christina M. Passard, P.C., Anchorage, and Mailee R. Smith, Americans United for Life, Washington, D.C., for Amicus Curiae Alaska Family Action.  Mario Bird, Ross & Minor, P.C., Anchorage, for Amicus Curiae Alaskan Doctors for Parental Notice.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

WINFREE, Justice.
FABE, Chief Justice, joined in part by Maassen and Bolger, Justices, concurring.
STOWERS, Justice, dissenting.

## I.    INTRODUCTION

Alaska's medical emancipation statute historically allowed minors to consent to pregnancy-related health care subject to an express exception for pregnancy termination.  In 2001 we held that under the Alaska Constitution's broad privacy guarantee a pregnant minor has the same fundamental privacy right to reproductive choice as an adult, and in 2007 we held that right cannot be conditioned on another's consent.  The 2007 ruling allowed minors to obtain all pregnancy-related health care — including pregnancy termination — without parental consent.

But in that 2007 ruling we recognized that the State of Alaska has compelling interests in aiding parents to help their minor children make informed and mature pregnancy-related decisions, and we indicated that a parental notification law *might* be implemented without unduly interfering with minors' fundamental privacy rights. The 2010 voter-enacted Parental Notification Law — generally requiring 48-hour advance parental notice before a physician may terminate a minor's pregnancy — revived the exception in the existing medical emancipation statute, creating considerable tension between a minor's fundamental privacy right to reproductive choice and how the State may advance its compelling interests.

In this case we must decide whether the Notification Law violates the Alaska Constitution, and we are presented with two specific and distinctly different questions: (1) Does the Notification Law violate the Alaska Constitution's equal protection guarantee by unjustifiably burdening the fundamental privacy rights only of minors seeking pregnancy termination, rather than applying equally to all pregnant minors? (2) If the Notification Law does not violate the Alaska Constitution's equal protection guarantee, does it violate the Alaska Constitution's privacy guarantee by unjustifiably infringing on the fundamental privacy rights of minors seeking to terminate a pregnancy?

We conclude that the Notification Law violates the Alaska Constitution's equal protection guarantee and cannot be enforced. But the decision we reach today is narrow in light of the limited State interests offered to justify the Notification Law. The State expressly disclaims any interest in *how* a minor exercises her fundamental privacy right of reproductive choice, and it does not suggest that it has an interest in limiting abortions generally or with respect to minors specifically. And as a court we are not concerned with whether abortion is right, wrong, moral, or immoral, or with whether abortions should be available to minors without restriction. We are concerned only with

whether, *given its stated underlying justifications*, the current Notification Law complies with the Alaska Constitution's equal protection guarantee — and it does not.

## II.     FACTS AND PROCEEDINGS

### A.     Early Statutory Backdrop

In 1968 the legislature enacted a medical emancipation statute allowing a physician to "examine a female minor over the age of 15 years with regard to pregnancy" without parental consent.[1]  But at that time a carry-over territorial criminal statute made abortion illegal "unless . . . necessary to preserve the life of the mother."[2]

In 1970 the legislature rewrote the criminal statute to allow certain abortions by licensed physicians in approved medical facilities.[3]  But a portion of the criminal statute, AS 11.15.060(a)(3), expressly required parental consent before "an unmarried woman less than 18 years of age" legally could obtain an abortion.[4]  In 1974 the legislature rewrote the medical emancipation statute to more broadly cover pregnancy-related medical care — except abortion — by stating that subject to AS 11.15.060(a)(3) "a minor may give consent for diagnosis, prevention or treatment of pregnancy."[5]

In 1976, presumably in reaction to then-recent United States Supreme Court decisions, the Alaska Attorney General issued an informal opinion on the validity of

---

[1]     Ch. 204, § 1, SLA 1968; former AS 09.65.100 (1968).

[2]     *See* former AS 11.15.060 (1962); § 65-4-6 Alaska Compiled Laws Annotated (1949).

[3]     Ch. 103, § 1, SLA 1970; former AS 11.15.060(a)(1)-(2) (1970).

[4]     Former AS 11.15.060(a)(3) (1970).

[5]     Ch. 73, § 1, SLA 1974; former AS 09.65.100(a)(4) (1974) renumbered as AS 25.20.025.

portions of AS 11.15.060.[6]  The Attorney General concluded that the parental consent provision was a "clearly unconstitutional" infringement of minors' fundamental privacy rights under the United States Constitution because it was a blanket ban — regardless of a minor's actual capacity or maturity — and it applied even when an abortion might be necessary to save a minor's life.[7]

In 1980 the legislature removed AS 11.15.060 from the criminal statutes and renumbered it as AS 18.16.010, but did not respond to the Attorney General's 1976 opinion that the parental consent provision violated the United States Constitution.[8]  The parental consent provision remained in place as AS 18.16.010(a)(3) until amended with the enactment of the 1997 Parental Consent Act.[9]  The relevant provision of the medical emancipation statute has not changed — other than replacing the exception's original reference to AS 11.15.060(a)(3) with a reference to AS 18.16.011(a)(3)[10] — although it was renumbered in 1994.[11]

## B.    Early Constitutional Backdrop

In 1972 voters added the following provision to the Alaska Constitution: "The right of the people to privacy is recognized and shall not be infringed."[12]  In 1997

---

[6]        1976 INFORMAL OP. ATT'Y GEN. (Oct. 21).

[7]        *Id.* at 3-6, 7.

[8]        Ch. 166, § 22, SLA 1978 (effective Jan. 1, 1980).  The statute later was reorganized.  *See* AS 18.16.010 (1986).

[9]        Ch. 14, §§ 2, 3, 6, SLA 1997.

[10]       Ch. 166, § 22, SLA 1978 (effective Jan. 1, 1980).

[11]       *See* AS 25.20.025(a)(4) (1994).

[12]       Alaska Const. art. I, § 22; *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*,
(continued...)

we examined this express privacy provision in the context of pregnancy-related decisions and held that a woman's fundamental privacy right to reproductive choice is more broadly protected by the Alaska Constitution than the United States Constitution.[13] And 15 years ago, in the constitutional equal protection context, we noted that "political disapproval" alone cannot justify treating women differently based upon how they exercise their reproductive choices.[14]

## C.     The 1997 Parental Consent Act

Shortly before our 1997 decision regarding a woman's broad fundamental privacy right to reproductive choice under the Alaska Constitution, the legislature enacted the Parental Consent Act.[15] The Consent Act amended AS 18.16.010(a)(3) to generally require parental consent before a minor under age 17 could terminate a pregnancy and added other provisions addressing the federal constitution privacy concerns the Supreme Court and the Alaska Attorney General raised in the mid-1970s.[16]

---

[12]     (...continued)
948 P.2d 963, 968 (Alaska 1997).

[13]     *Valley Hosp. Ass'n*, 948 P.2d at 966-69.

[14]     *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 905 (Alaska 2001) (stating that "political disapproval" does not justify denying Medicaid coverage to women seeking abortions when coverage is granted to women seeking to carry to term). *See also* Alaska Const. art. I, § 1 (providing that all persons are "entitled to equal rights, opportunities, and protection under the law").

[15]     Ch.14, §§ 1-10, SLA 1997; *see also* former AS 18.16.010(a)(3) (2004); former AS 18.16.020 (2004).

[16]     Ch.14, §§ 1-10, SLA 1997; *cf.* INFORMAL OP. ATT'Y GEN., *supra* note 6 at 3-6, 7.

The Consent Act's constitutionality soon was challenged.[17] The superior court enjoined the State from enforcing the Consent Act, summarily concluding that it violated the Alaska Constitution's equal protection guarantee.[18] The State appealed, and in *Planned Parenthood I* we remanded for a full trial.[19] But we acknowledged that under the Alaska Constitution pregnant minors have the same fundamental privacy right to reproductive choice as pregnant adults:

> The "uniquely personal" physical, psychological, and economic implications of the abortion decision that we described in *Valley Hospital* are in no way peculiar to adult women. Deciding whether to terminate a pregnancy is at least as difficult, and the consequences of such decisions are at least as profound, for minors as for adults . . . .[20]

After trial the superior court concluded that the Consent Act violated both the privacy and equal protection guarantees of the Alaska Constitution, and again enjoined the State from enforcing the Consent Act.[21] The State appealed, and in *Planned Parenthood II* we held that although the State had shown compelling interests "in protecting minors from their own immaturity" and in "aiding parents to fulfill their parental responsibilities," the Consent Act was not the least restrictive means of

---

[17] *See State v. Planned Parenthood of Alaska* (*Planned Parenthood I*), 35 P.3d 30, 32-33 (Alaska 2001).

[18] *Id.* at 33; *see* Alaska Const. art. I, § 1 (guaranteeing "equal rights, opportunities, and protection under the law").

[19] *Planned Parenthood I*, 35 P.3d at 46.

[20] *Id.* at 40 (footnote omitted), *quoted with approval in State v. Planned Parenthood of Alaska* (*Planned Parenthood II*), 171 P.3d 577, 582 & n.26 (Alaska 2007).

[21] *Planned Parenthood II*, 171 P.3d at 580-81.

furthering those interests.[22]  We explained that requiring parental notification before terminating a minor's pregnancy could effectively meet the State's interests while imposing a lower burden on the minor's constitutional privacy right.[23]  Because we concluded that the Consent Act was an unconstitutional infringement on fundamental privacy rights,[24] effectively ruling that all pregnant minors — not just those seeking to carry to term — were covered equally by the medical emancipation statute, we had no reason to address the equal protection question arising from the Consent Act.[25]

### D.    The Parental Notification Law

After our *Planned Parenthood II* decision, Loren Leman, Mia Costello, and Kim Hummer-Minnery (the Sponsors) sponsored a parental notification voter initiative.[26] In August 2010 voters approved the initiative, titled the Parental Notification Law,[27] constructed by amending the existing but unenforceable Consent Act.[28]  A parental notification component was placed in AS 18.16.010(a)(3),[29] thus reviving the medical

---

[22]    *Id.* at 582-83, 585.

[23]    *Id.* at 584-85.

[24]    *Id.* at 583-86.

[25]    *See id.* at 581 n.21, 585 ("Because we conclude that the [Consent Act] violates the right to privacy under the Alaska Constitution, we need not address [whether] the Act also violates the equal protection clause . . . .").

[26]    *See Planned Parenthood of Alaska v. Campbell*, 232 P.3d 725, 727 (Alaska 2010) (discussing the initiative's procedural history).

[27]    AS 18.16.010-.040.

[28]    Alaska Laws Initiative Meas. 2 (Bal. Meas. 2), 26th Leg., 2d Sess. (2010).

[29]    AS 18.16.010(a)(3) generally provides that a physician may not perform an abortion for a "pregnant, unmarried, unemancipated woman under 18" absent advance
(continued...)

emancipation statute's differential treatment of pregnant minors based on how they exercised their fundamental privacy right of reproductive choice.[30]

The Notification Law applies to unemancipated, unmarried minors under age 18 seeking to terminate a pregnancy.[31] It includes specific requirements for parental notification,[32] a 48-hour mandatory waiting period between parental notification and the

---

[29] (...continued)
parental notice or judicial authorization to proceed without parental involvement, as set forth in related Notification Law provisions.

[30] *Cf.* AS 25.20.025(a)(4) ("Except as prohibited under AS 18.16.010(a)(3)" minors may give consent to pregnancy-related health care.).

[31] AS 18.16.020(a) (prohibiting, absent parental notice or other exception, persons from performing or inducing an abortion upon "a minor who is known . . . to be pregnant, unmarried, under 18 years of age, and unemancipated").

[32] AS 18.16.020(b) provides in part:

An individual designated by the physician may initiate the notification process, but the actual notice shall be given by the physician. The physician giving notice of the abortion must document the notice or attempted notice in the minor's medical record and take reasonable steps to verify that the person to whom the notice is provided is the parent, legal guardian, or custodian of the minor seeking an abortion. Reasonable steps to provide notice must include

(1) if in person, requiring the person to show government-issued identification along with additional documentation of the person's relationship to the minor; additional documentation may include the minor's birth certificate or a court order of adoption, guardianship, or custodianship;

(2) if by telephone, initiating the call, attempting to verify through a review of published telephone directories

(continued...)

termination of a minor's pregnancy (absent a parent's earlier written consent),[33] and criminal and civil penalties for any physician who terminates a minor's pregnancy without complying with the notification requirements.[34]

The Notification Law includes an exception for certain medical emergencies.[35] It also includes two provisions for bypassing parental notification.[36]

---

[32] (...continued)
that the number to be dialed is that of the minor's parent, legal guardian, or custodian, and asking questions of the person to verify that the person's relationship to the minor is that of parent, legal guardian, or custodian; when notice is attempted by telephone [but is unsuccessful, the physician or designee] shall continue to initiate the call, in not less than two-hour increments, for not less than five attempts, in a 24-hour period.

AS 18.16.020(c) provides that if the attempts required under AS 18.16.020(b) are unsuccessful, then the physician:

may provide constructive notice to the minor's parent, legal guardian, or custodian. Constructive notice is considered to have been given 48 hours after the certified notice is mailed. In this subsection, "constructive notice" means that notice of the abortion was provided in writing and mailed by certified mail, delivery restricted to addressee only, to the last known address of the parent, legal guardian, or custodian after taking reasonable steps to verify the mailing address.

[33] *See* AS 18.16.020(a)(1)(A)-(B).

[34] AS 18.16.010(c) (providing fines of up to $1,000 and/or imprisonment up to five years); AS 18.16.010(e) (providing civil liability for compensatory and punitive damages to the minor and the minor's parents, guardian, or custodian).

[35] AS 18.16.010(g)(3) (defining "medical emergency" as "necessary to avert the minor's death" or when delay "will create serious risk of medical instability caused
(continued...)

First, with the assistance of a court-appointed attorney,[37] a minor may seek a judge's permission to bypass the notification requirement.[38] Permission will be granted if the minor proves by clear and convincing evidence[39] that she is mature enough to make the decision without parental notice or consent or that her parents are abusive.[40] Second, an abused minor may bypass the notification requirement by providing to her physician notarized statements from herself and a witness regarding the abuse.[41] If an abused

---

[35] (...continued)
by a substantial and irreversible impairment of a major bodily function").

[36] *See* AS 18.16.030; AS 18.16.020(a)(4).

[37] AS 18.16.030(d), (n)(3).

[38] AS 18.16.030.

[39] AS 18.16.030(e), (f).

[40] AS 18.16.030(b)(4) provides that permission to bypass the notification requirement will be granted if the minor proves:

> (A) that [she] is sufficiently mature and well enough informed to decide intelligently whether to have an abortion without notice to . . . a parent, guardian, or custodian; or

> (B) that one or both of the minor's parents or the minor's guardian or custodian was engaged in physical abuse, sexual abuse, or a pattern of emotional abuse against the minor . . . .

[41] AS 18.16.020(a)(4) allows minors who are victims of "physical abuse, sexual abuse, or a pattern of emotional abuse committed by one or both of the minor's parents or by a legal guardian or custodian of the minor" to bypass notification by providing signed and notarized statements to the physician from the minor and from a witness with "personal knowledge" documenting the abuse. The witness must be a law enforcement officer, an Alaska Department of Health and Social Services representative who has investigated the abuse, or the minor's sibling over the age of 21, grandparent,
(continued...)

minor pursues this option, then the physician must report the abuse to the Alaska Department of Health and Social Services.[42]

E.     This Case

Planned Parenthood of the Great Northwest and two doctors who perform abortions in Alaska (collectively Planned Parenthood) sought to enjoin enforcement of the Notification Law on the grounds that it violates the Alaska Constitution's privacy and equal protection guarantees. The Sponsors intervened to defend the Notification Law. The superior court denied a requested preliminary injunction against the law as a whole, although it preliminarily enjoined several "peripheral features": criminal punishment and civil liability for physicians; the requirement that only the physician — not an assistant — notify parents; the requirement that parents show government-issued identification during in-person notification to document that they are the minor's parents; and the clear and convincing evidence standard for the judicial bypass procedure.

After trial the superior court made broad findings of fact on a number of issues, including how the Notification Law had functioned for the 14 months between its effective date and the trial. The court rejected Planned Parenthood's argument that the Notification Law violates equal protection by treating pregnant minors seeking termination differently from those seeking to carry to term. The court stated that Alaska's medical emancipation statute encourages pregnant minors to seek medical care which they otherwise might avoid for fear of parental involvement, and then reasoned that "once a minor elects an imminent abortion, the core rationale underpinning medical emancipation no longer applies to her; she no longer requires encouragement to see a

_____

[41]     (...continued)
or stepparent. No other witnesses are permitted. AS 18.16.020(a)(4)(B).

[42]     AS 18.16.020(d); *see also* AS 47.17.020; AS 47.17.290(6).

doctor to protect her own health and that of her fetus." The court therefore concluded that minors seeking pregnancy termination are not similarly situated to minors seeking to carry to term, and that the Notification Law's effective disparate application of the medical emancipation statute "does not violate Alaska's equal protection clause."

The superior court also analyzed whether the Notification Law violates minors' constitutional privacy rights and concluded that parts of the law are constitutional but others are not. The court vacated its preliminary injunction against some provisions, including the criminal sanctions for physicians and the parental-documentation requirement; it issued a permanent injunction against others, including the imposition of civil liability on physicians, the requirement that physicians personally notify parents, and the clear and convincing evidence standard for judicial bypass of the notification requirement.

The superior court issued a final judgment, and the clerk of court then awarded the State and the Sponsors their trial costs. The superior court later vacated the cost awards, concluding that both sides were prevailing parties on a main issue in the case and that no cost awards should be made.

Planned Parenthood appeals the superior court's ruling upholding the majority of the Notification Law, arguing for reversal on both equal protection and privacy grounds. The State and the Sponsors appeal the court's decision to strike some of the Notification Law's provisions, arguing that those provisions do not violate minors' constitutional privacy rights; they also appeal the costs ruling.

## III.   STANDARD OF REVIEW

We apply our independent judgment to equal protection claims.[43]   In an equal protection analysis we must identify and assess the nature and importance of the competing personal and governmental interests at stake, identify the relevant level of scrutiny for governmental action, and assess the means chosen to advance governmental interests.[44]   These are questions of law to which we apply our independent judgment, adopting "the rule of law 'most persuasive in light of precedent, reason, and policy.' "[45] Underlying findings of fact are reviewed for clear error.[46]

## IV.   DISCUSSION

We begin by noting that a challenge to a statute "must overcome a presumption of constitutionality."[47]   When a statute's constitutionality is facially challenged, we will uphold the statute even if it might occasionally create constitutional

---

[43]     *Matanuska-Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 397 (Alaska 1997) ("This court exercises its independent judgment in deciding equal protection claims.").

[44]     *State v. Schmidt*, 323 P.3d 647, 655 (Alaska 2014) (quoting *Alaska Civil Liberties Union v. State*, 122 P.3d 781, 785 (Alaska 2005)).

[45]     *Id.* (quoting *State v. Anthony*, 810 P.2d 155, 156-57 (Alaska 1991)).

[46]     *See Planned Parenthood II*, 171 P.3d 577, 581 (Alaska 2007) (stating in context of constitutional challenge that "[w]e review the superior court's factual determinations for clear error" (citing *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003))).   The parties dispute whether we should review the superior court's findings of "constitutional" or "legislative" facts de novo or for clear error.   Because we are not persuaded that the superior court's factual findings on which we rely would be erroneous under either standard, we do not need to address this dispute.

[47]     *Schmidt*, 323 P.3d at 655 (quoting *Alaska Civil Liberties Union*, 122 P.3d at 785); *see also Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 192 (Alaska 2007).

problems in its application, as long as it "has a plainly legitimate sweep."[48] But a statute infringing on a constitutionally protected right deserves close attention.[49] And our duty to uphold the Alaska Constitution is paramount; it takes precedence over the politics of the day and our own personal preferences.[50]

---

[48] *Planned Parenthood II*, 171 P.3d at 581 (quoting *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 n.14 (Alaska 2004)); *see also Haggblom v. City of Dillingham*, 191 P.3d 991, 998 (Alaska 2008) ("We will not hold a statute void for vagueness if the statute has been shown to have a 'plainly legitimate sweep.' " (quoting *Treacy*, 91 P.3d at 260 n.14)); *Planned Parenthood I*, 35 P.3d 30, 34-35 (Alaska 2001) (concluding that our previous standard — that a statute will be upheld unless there is "no set of circumstances . . . under which" it would be constitutional — is not a "rigid requirement" (quoting *Javed v. State, Dep't of Pub. Safety*, 921 P.2d 620, 625 (Alaska 1996))).

Even under the stricter "no set of circumstances" analysis, only the effective applications of a statute authorizing or prohibiting conduct should be considered. *Los Angeles v. Patel*, 135 S.Ct. 2443, 2450-51 (2015). A law is measured for constitutional validity "by its impact on those whose conduct it affects," and the proper constitutional inquiry focuses on "the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 894 (1992).

[49] *See, e.g.*, *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 912 (Alaska 2001) ("Because [the regulation] infringes on a constitutionally protected interest, the State bears a high burden to justify the regulation."); *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1261 (Alaska 1980) (noting strict scrutiny applies "when fundamental rights are at stake"); *see also Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 633 (N.J. 2000) (stating governmental burden on fundamental right "is deserving of the most exacting scrutiny").

[50] *See* Alaska Const. art. XII, § 5 (requiring public officers to swear to "support and defend . . . the Constitution of the State of Alaska"); *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982) ("[T]he judicial branch . . . has the constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution . . . ."), *quoted with approval in Planned Parenthood of Alaska*, 28 P.3d at 913.

Finally, relevant to today's issues, our opening statement in *Planned Parenthood II* bears repeating:

> From time to time, we are called upon to decide constitutional cases that touch upon the most contentious moral, ethical, and political issues of our day. In deciding such cases, we are ever mindful of the unique role we play in our democratic system of government. We are not legislators, policy makers, or pundits charged with making law or assessing the wisdom of legislative enactments. We are not philosophers, ethicists, or theologians, and "cannot aspire to answer" fundamental moral questions or resolve societal debates. We are focused only on upholding the constitution and laws of the State of Alaska.[51]

## A. Equal Protection

### 1. *Planned Parenthood II*'s non-effect on the challenge

The State, the dissent — and to a lesser degree the concurring opinion — assert that our *Planned Parenthood II* decision forecloses an equal protection challenge to the Notification Law; the State argues that "[w]hen this Court held in *Planned Parenthood II* that a parental notification law was a constitutional option that was less restrictive than the parental consent law, by implication it also rejected [the current] equal protection challenge." We disagree.

In *Planned Parenthood II* we held that the Consent Act was an unconstitutional infringement on pregnant minors' constitutional privacy rights because a notification statute potentially could be a less restrictive alternative furthering the State's compelling interests.[52] Although in that decision's introduction we made the broad conclusory statement that "the constitution permits a statutory scheme which

---

[51] *Planned Parenthood II*, 171 P.3d at 579 (footnote omitted) (quoting *Planned Parenthood of Alaska*, 28 P.3d at 906).

[52] *See id.* at 583-85.

-16-                                                                    7114

ensures that parents are notified so that they can be engaged in their daughters' important decisions in [pregnancy-related] matters,"[53] our holding addressed only the fundamental right to privacy.[54] We explained that "although parental notification statutes undoubtedly burden the *privacy* rights of minors," they would present potentially less restrictive alternatives than consent laws under a fundamental privacy right analysis.[55] We did not address *other* constitutional issues which might arise from a notification law — indeed, a notification law was merely hypothetical at that point.[56] And because our privacy ruling involving the consent law effectively placed all pregnant minors on an equal plane under the medical emancipation statute, we did not address the equal protection challenge to the Consent Act.[57]

The dissent and the concurring opinion unreasonably conclude we suggested that any parental notification law would pass constitutional equal protection muster — sight unseen and without regard to either its stated justification or the factual underpinning for that justification — even though we engaged in no equal protection analysis whatsoever regarding parental notification laws. Our actual conclusion that a parental notification law might survive a constitutional privacy challenge does not mean

---

[53]     *Id.* at 579.

[54]     *Id.* at 584.

[55]     *Id.* (emphasis added).

[56]     *See generally id.*

[57]     *Id.* at 581 n. 21, 585 ("Because we conclude that the [Consent Act] violates the right to privacy under the Alaska Constitution, we need not address [whether] the Act also violates the equal protection clause . . . .").

that every conceivable notification law will do so.[58]  Nor does it mean that every conceivable notification law will satisfy the separate and independent constitutional equal protection standard.  In the fundamental rights context there is a significant difference between Alaska's privacy and equal protection guarantees:  The privacy clause guarantees that the State may not infringe upon an individual's fundamental right of personal autonomy unless a compelling governmental interest justifies the infringement; in contrast the equal protection clause guarantees that the State may not discriminate between individuals with respect to a fundamental right unless a compelling governmental interest justifies the discrimination.[59]

The dissent and the concurring opinion also fail to recognize governing precedent from *Sands ex rel. Sands v. Green*,[60] involving a constitutional challenge to 1997's reformed statute of limitations tolling provision.[61]  Earlier, in *Evans ex rel. Kutch*

---

[58]    The concurring opinion's conclusion that the Notification Law is unconstitutional under a privacy rights analysis should make this abundantly clear.

[59]    *Compare* Alaska Const. art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed."), *and Ranney v. Whitewater Eng'g*, 122 P.3d 214, 221 (Alaska 2005) ("The right of privacy protects 'fundamental rights of personal autonomy' . . . ." (quoting *Sampson v. State*, 31 P.3d 88, 94 (Alaska 2001))), *with* Alaska Const. art. I, § 1 ("[A]ll persons are equal and entitled to equal rights, opportunities, and protection under the law . . . ."), *and State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska*, 28 P.3d 904, 909 (Alaska 2001) ("Alaska's constitutional equal protection clause . . . protects Alaskans' right to non-discriminatory treatment . . . ."); *also compare Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975) (fundamental rights analysis), *with Titus v. State, Dep't of Admin., Div. of Motor Vehicles*, 305 P.3d 1271, 1278-79 (Alaska 2013) (equal protection analysis).

[60]    156 P.3d 1130 (Alaska 2007).

[61]    *Id.* at 1131-36.

*v. State*,[62] the four-person court had addressed whether the new provision passed constitutional equal protection muster, and two justices concluded that it did.[63] In *Sands* the same statutory provision was challenged on the different constitutional ground that it violated minors' due process rights of access to the court.[64] We rejected the argument — essentially the same argument raised here by the dissent and the concurring opinion — that the first decision implicitly controlled the result in the second:

> In *Evans*, we assessed the constitutionality of subsection .140(c) only within the context of equal protection. We did not address the issue that we address today: whether subsection .140(c) violates a minor's due process right to access the court system. We are similarly unpersuaded by the State's argument that we were "aware of the ramifications of [our *Evans*] decision" because "Justice Carpeneti pointedly discussed those ramifications in a detailed dissent." While the dissent in *Evans* did indeed discuss the ramifications of subsection .140(c) and argue that those ramifications constitute a denial of equal protection, it — like the lead opinion — did not consider the specific issue of due process.
>
> That our *Evans* decision did not reach this particular constitutional issue merely reinforces the wisdom of the rule that courts should generally avoid deciding abstract cases.[65]

---

[62]   56 P.3d 1046 (Alaska 2002).

[63]   *Id.* at 1066 (concluding "subsection .140(c)'s disparate treatment of minors under the age of eight is rationally based and furthers legitimate state interests").

[64]   *Sands*, 156 P.3d at 1133.

[65]   *Id.* (alteration in original) (footnotes omitted).

In *Planned Parenthood II* we answered the question whether the then-existing parental consent law violated minors' constitutional privacy rights,[66] and declined to answer the question whether the then-existing parental *consent* law violated minors' constitutional equal protection rights.[67] Here we face the new and very different question whether the current parental notification law violates minors' constitutional equal protection rights. Suggesting that we somehow answered a question that was not actually asked in *Planned Parenthood II* is both incorrect and contrary to precedent. In every case we decide what we decide, and nothing more.

In short, the Notification Law stands or falls on its own specific terms and stated justifications.

### 2.     The equal protection analysis — overview

The Alaska Constitution's equal protection guarantee requires "equal treatment of those similarly situated."[68] As we have previously explained in the context of a law treating two groups differently:

> When equal protection claims are raised, the question is whether two groups of people who are treated differently are similarly situated and therefore are entitled to equal treatment under the constitution. *In order to determine whether differently treated groups are similarly situated, we look to the state's reasons for treating the groups differently.*

---

[66]     *Planned Parenthood II*, 171 P.3d 577, 581 n.21, 583-86 (Alaska 2007).

[67]     *Id.* at 581 n.21, 585.

[68]     *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 909 (Alaska 2001) (quoting *Alaska Pac. Assurance Co. v. Brown*, 687 P.2d 264, 271 (Alaska 1984)).

> As a matter of nomenclature we refer to that portion of a law that treats two groups differently as a "classification."[69]

To determine whether the Notification Law discriminates between similarly situated classes, we first decide which classes must be compared.[70] The parties agree that the relevant classes are pregnant minors seeking termination and pregnant minors seeking to carry to term. We next determine if the challenged law has a discriminatory purpose or is facially discriminatory — i.e., whether the classes are treated unequally.[71] It is clear that the Notification Law treats the two classes of pregnant minors differently, burdening the fundamental privacy rights of those seeking termination but not the fundamental privacy rights of those seeking to carry to term.[72] So when we examine whether these classes are similarly situated, we are asking a legal question: Under the applicable scrutiny level, do the stated rationales for the Notification Law justify

---

[69] *Pub. Emps. Ret. Sys. v. Gallant*, 153 P.3d 346, 349 (Alaska 2007) (emphasis added) (footnotes omitted). Similarly see *Stanek v. Kenai Peninsula Borough*, 81 P.3d 268, 270-71 (Alaska 2003) (quoting extensively from *Gonzales v. Safeway Stores, Inc.*, 882 P.2d 389, 396 (Alaska 1994)) explaining that we view statutory enactment with differential treatment as creating separate groups and that we ask whether such classification has sufficient government justification under the appropriate level of scrutiny.

[70] *State v. Schmidt*, 323 P.3d 647, 660 (Alaska 2014).

[71] *Id.* at 659 (citing *Alaska Civil Liberties Union v. State*, 122 P.3d 781, 788 (Alaska 2005); *Alaska Inter-Tribal Council v. State*, 110 P.3d 947, 956 (Alaska 2005)). "When a 'law by its own terms classifies persons for different treatment,' the law is facially discriminatory." *Id.* (quoting *Alaska Civil Liberties Union*, 122 P.3d at 788).

[72] *See* AS 18.16.020(a).

discriminating between pregnant minors who choose to terminate a pregnancy and those who choose to carry to term?[73]

The State agrees with the foregoing legal framework. The Sponsors, however, cite *Alaska Inter-Tribal Council v. State*[74] for a different line of equal protection cases and argue that whether two classes are similarly situated is a threshold matter to be decided before considering whether there are valid reasons for treating them differently and that "similarly situated" is a question of fact reviewed for clear error.

*Alaska Inter-Tribal Council* did not involve an equal protection challenge to a statute classifying two groups of people, but rather to an alleged geographically discriminatory policy of police resource allocation in Alaska.[75] In that context, citing a federal case, we stated that whether persons, groups, or entities "are similarly situated is generally a question of fact."[76] The federal case we relied upon similarly did not involve an equal protection challenge to a statute classifying two groups of people, but rather to an alleged selective enforcement of a zoning ordinance, i.e., discrimination against a

---

[73] *See, e.g.*, *Gallant*, 153 P.3d at 351-55 (applying independent judgment); *Stanek*, 81 P.3d at 269-71 (applying independent judgment); *Gonzales*, 882 P.2d at 396-99 (applying independent judgment).

[74] 110 P.3d at 947.

[75] *Id.* at 966.

[76] *Id.* at 967 (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)). We ultimately concluded, in part, that the superior court's findings of fact about the various geographical locations "show that the superior court did not clearly err in finding that the two asserted similarities are not the relevant, much less the *only* relevant, points of comparison for determining the issue of similarly-situatedness." *Id.* at 969 (emphasis in original).

"class of one."[77] *Alaska Inter-Tribal Council* did not purport to overrule the stated framework when considering statutory enactments, used as early as 1994 in *Gonzales v. Safeway Stores, Inc.*[78] and then as recently as 2003 in *Stanek v. Kenai Peninsula Borough*,[79] and used again not long after *Alaska Inter-Tribal Council* in *Public Employees Retirement System v. Gallant*.[80]

We separately noted in *Alaska Inter-Tribal Council* that there are some occasions when a full equal protection analysis may not be necessary because it is so exceedingly clear that the two classes in question are not similarly situated.[81] When

---

[77]    273 F.3d at 499.  Although we do not need to delve into the matter now, a close reading of this case suggests that the federal court actually may have applied a mixed question of fact and law analysis, looking to the trial court's factual determinations about business locations and then applying independent judgment to whether, given the facts found by the trial court, the zoning board had a rational basis for its decision. *Compare id.* at n.2 and at 500-02.  This would be consistent with the legal framework we use today.

[78]    882 P.2d at 396.

[79]    81 P.3d 268, 270-71 (Alaska 2003).

[80]    153 P.3d 346, 349-54 (Alaska 2007).

[81]    110 P.3d at 967.  We will summarily conclude that two classes are not similarly situated only in clear cases because "[s]uch a conclusion reflects in shorthand the analysis traditionally used in our equal protection jurisprudence." *Shepherd v. State, Dep't of Fish & Game*, 897 P.2d 33, 44 n.12 (Alaska 1995).  *But see id.* at 46 (Rabinowitz, J., concurring) (arguing that the shorthand analysis "inadequately analyzes the issue in this case" and "simply begs the question of whether the classification itself is reasonable and whether it justifies disparate treatment").

*State v. Schmidt*, 323 P.3d 647 (Alaska 2014), reflects a somewhat mixed approach.  *Schmidt* involved a property tax exemption scheme for certain married property owners. *Id.* at 651-53.  Same-sex couples then-barred under Alaska law from marrying raised an equal protection challenge. *Id.* at 653-54.  We first cited *Alaska*

(continued...)

combined with our statement that whether two classes are similarly situated is "generally" a question of fact, we may have created some ambiguity about the standard of review for "similarly situated" when examining an equal protection challenge under the "shorthand analysis" — is it a question of fact or is it a mixed question of fact and law? Although we presently perceive no reason there would be a different underpinning for a shorthand analysis and a full analysis of an equal protection challenge to a statute classifying two groups of people, we do not need to address that question here.

The superior court stated that our equal protection analysis applied to the extent the Notification Law "treats minors opting to carry to term differently from minors opting to abort." The court applied its fact-finding about pregnancies and abortions and their interplay with the Notification Law's stated justifications to conclude — not with a shorthand analysis, not as a purported finding of fact, but rather as a matter of law — that once a minor elected to undergo an abortion the justifications for medical emancipation did not apply and the justifications for parental involvement applied more heavily, so that she no longer was similarly situated with a minor electing to carry to

---

[81]     (...continued)
*Inter-Tribal Council* for the proposition that "similarly situated" generally is a question of fact. *Id.* at 655. We examined as a threshold matter whether committed same-sex couples who wanted (but were prohibited by law) to marry were similarly situated to opposite-sex couples who wanted to marry. *Id.* at 660-61. But rather than resolving the "similarly situated" issue purely as a factual matter reviewed for clear error, or even through a shorthand analysis of "similarly situated" as a factual matter reviewed for clear error, we considered the superior court's factual findings about the similarities of long-term commitments by same-sex domestic partners and married couples and held as a matter of law that same-sex couples who would marry if allowed to do so were — for purposes of the tax exemption program — similarly situated to married couples. *Id.* at 661. We then undertook the usual equal protection analysis to determine whether discrimination between married couples and same-sex couples could be justified under the government interests raised to support the tax exemption scheme. *Id.* at 662-64.

term. We will review that legal conclusion under the framework outlined above and detailed more fully below.

### 3. Core equal protection analysis

Our core equal protection analysis applies a flexible three-step sliding-scale:

> First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the challenged enactment. . . . Depending upon the primacy of the interest involved, the state will have a greater or lesser burden in justifying its legislation.
>
> Second, an examination must be undertaken of the purposes served by a challenged statute. Depending on the level of review determined, the state may be required to show only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest.
>
> Third, an evaluation of the state's interest in the particular means employed to further its goals must be undertaken. Once again, the state's burden will differ in accordance with the determination of the level of scrutiny under the first stage of analysis. At the low end of the sliding scale, we have held that a substantial relationship between means and ends is constitutionally adequate. At the higher end of the scale, the fit between means and ends must be much closer. If the purpose can be accomplished by a less restrictive alternative, the classification will be invalidated.[82]

#### a. Step one

Step one of our core equal protection analysis requires evaluating the importance of the personal right infringed upon to determine the State's burden in justifying its differential infringement. It has long been established that the Alaska

---

[82] *Alaska Pac. Assurance Co. v. Brown*, 687 P.2d 264, 269-70 (Alaska 1984).

Constitution's privacy clause guarantees the fundamental right to choose between pregnancy termination and carrying to term.[83]  And it has long been established that a law burdening the fundamental right of reproductive choice demands strict scrutiny.[84]

Whether the Notification Law survives strict scrutiny "depends on whether the [law] is narrowly tailored and whether there is a less restrictive alternative to meet the [State's] interest."[85]  For the Notification Law "[t]o be narrowly tailored, there must be a sufficient nexus between the stated government interest and the classification created by the [law]."[86]  This nexus must not be too under- or over-inclusive; as we have explained:

> As the level of scrutiny selected is higher on the [sliding] scale, we require that the asserted governmental interests be relatively more compelling and that the legislation's means-to-ends fit be correspondingly closer.  On the other hand, if relaxed scrutiny is indicated, less important governmental objectives will suffice and a greater degree of over/or

---

[83]     *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 968-69 (Alaska 1997) (establishing fundamental privacy right for pregnant women); *Planned Parenthood I*, 35 P.3d 30, 40-41 (Alaska 2001) (extending fundamental privacy right to pregnant minors).

[84]     *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 909 (Alaska 2001) ("The regulation at issue in this case affects the exercise of a constitutional right, the right to reproductive freedom.  Therefore, the regulation is subject to the most searching judicial scrutiny, often called 'strict scrutiny.' " (footnote omitted)).  We reject the Sponsors' argument that the State only needs to advance a rational basis for treating the two groups of pregnant minors differently because those seeking termination are a "nonsuspect classification."

[85]     *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 266 (Alaska 2004).

[86]     *Id.* (quoting *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 946 (9th Cir. 1997)).

underinclusiveness in the means-to-ends fit will be tolerated.[87]

### b. Step two

Step two of our core equal protection analysis requires identifying and assessing the State's interests in differently burdening pregnant minors' fundamental privacy rights. To justify differently burdening fundamental privacy rights, the State's interests in doing so must be compelling.[88] The State asserts two main interests as justifying the Notification Law's disparate treatment of pregnant minors: (1) "aiding parents to fulfill their parental responsibilities" and (2) "protecting minors from their immaturity."[89]

---

[87] *State, Dep't of Revenue, Permanent Fund Dividend Div. v. Cosio*, 858 P.2d 621, 629 (Alaska 1993) (alteration in original) (quoting *State v. Ostrosky*, 667 P.2d 1184, 1193 (Alaska 1983)).

[88] A governmental interest must be more than legitimate to be "compelling." To prove an interest compelling in the equal protection context, the State must show that the interest actually needs to be vindicated because it is significantly impaired at present. *See, e.g.*, *Vogler v. Miller*, 651 P.2d 1, 5-6 (Alaska 1982); *Gray v. State*, 525 P.2d 524, 528 (Alaska 1974); *Breese v. Smith*, 501 P.2d 159, 172 (Alaska 1972).

Although we cite cases discussing the word "compelling" in the fundamental privacy rights context, the meaning of "compelling" as an adjective is the same in the equal protection context. Where our fundamental privacy rights and equal protection analyses differ is in the necessary justification: In the fundamental privacy rights context, the compelling interest must be important enough to justify infringing on a right, but in the equal protection context, the compelling interest must be important enough to justify treating two classes differently regarding such a right. *See supra* note 59 and accompanying text.

[89] In *Planned Parenthood II* the State asserted that the Consent Act served five governmental interests: "(1) ensure that minors make an informed decision on whether to terminate a pregnancy; (2) protect minors from their own immaturity; (3) protect minors' physical and psychological health; (4) protect minors from sexual

(continued...)

We accept that the State asserts compelling interests: In *Planned Parenthood II* we said that "the State has an undeniably compelling interest in protecting the health of minors and in fostering family involvement in a minor's decisions regarding her pregnancy."[90] And we later stated that "on the most generalized level," the State has a compelling interest in "protecting minors from their own immaturity and aiding parents in fulfilling their parental responsibilities."[91] But we note that the interest in "protecting minors from their immaturity" requires context — immaturity in and of itself is not a

---

[89] (...continued)
abuse; and (5) strengthen the parent-child relationship." 171 P.3d 577, 582 n.29 (Alaska 2007). We grouped these interests into the "generalized" interests of "protecting minors from their own immaturity and aiding parents in fulfilling their parental responsibilities." *Id.* at 582.

Here the State asserts that its interest in protecting minors from their own immaturity includes ensuring that they use "moral imagination" in making their decisions. We assume the State is not implying that minors seeking to terminate a pregnancy are more lacking in "moral imagination" than those seeking to carry to term or that one decision is more or less ethical than the other, but rather is simply asserting that minors' inability to fully appreciate ethical concerns puts their physical, psychological, and/or sexual health at greater risk such that they are in need of more protection. *Cf. State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 905 (Alaska 2001) ("Alone among Medicaid-eligible Alaskans, women whose health is endangered by pregnancy are denied health care based solely on political disapproval of the medically necessary procedure. This selective denial of medical benefits violates Alaska's constitutional guarantee of equal protection."); *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 971 (Alaska 1997) (concluding "matter of conscience" not a compelling governmental interest); *Ravin v. State*, 537 P.2d 494, 509 (Alaska 1975) ("The state cannot impose its own notions of morality, propriety, or fashion on individuals . . . ."). The State expressly stated at oral argument that it has no interest, compelling or otherwise, in affecting a pregnant minor's ultimate reproductive choice.

[90] *Planned Parenthood II*, 171 P.3d at 579.

[91] *Id.* at 582.

harm. As we stated in *Planned Parenthood II*, "minors often do not possess the capacity to make informed, mature decisions, *and are therefore susceptible to a host of pitfalls and dangers unknown in adult life*."[92] The State's interest in "protecting minors from their immaturity" is in protecting minors from specific pitfalls and dangers to which their immaturity makes them especially susceptible. We therefore will consider the State's interest in "protecting minors from their immaturity" in the contexts of relevant stated harms: risks to mental and physical health and from sexual abuse.[93]

### c. Step three

Having determined that the Notification Law (1) burdens a class of pregnant minors' fundamental privacy rights and (2) was motivated by compelling state interests, we now examine, under strict scrutiny, whether vindicating the State's compelling interests justifies imposing disparate burdens on the two groups of pregnant minors' fundamental privacy rights. To survive strict scrutiny the Notification Law's disparate treatment of the two classes "must further a compelling state interest and be the least restrictive means available to accomplish the state's purpose."[94] If the means-to-end fit between the State's purpose and the Notification Law is not close enough — if the Notification Law is under-inclusive or over-inclusive — then it will not survive strict scrutiny.[95]

---

[92]     *Id.* (emphasis added).

[93]     *See supra* note 89.

[94]     *Schiel v. Union Oil Co. of Cal.*, 219 P.3d 1025, 1030 (Alaska 2009).

[95]     *See State v. Ostrosky*, 667 P.2d 1184, 1193 (Alaska 1983) ("As the level of scrutiny selected is higher . . . we require that . . . the legislation's means-to-ends fit be correspondingly closer. On the other hand, if relaxed scrutiny is indicated, . . . a greater degree of over[inclusiveness ]or underinclusiveness in the means-to-ends fit will
(continued...)

### i.    Parental involvement[96]

We conclude that vindicating the State's compelling interest in encouraging parental involvement in minors' pregnancy-related decisions does not support the Notification Law's disparate treatment of the two classes of pregnant minors. Parents do have an "important 'guiding role' to play in the upbringing of their children."[97] We have said that "it is the right and duty, privilege and burden, of all parents to involve themselves in their children's lives; to provide their children with emotional, physical, and material support; and to instill in their children 'moral standards, religious beliefs, and elements of good citizenship.' "[98] But as the State acknowledged at oral argument, this must be true for *all* pregnant minors' parents, not just those whose daughters are considering termination.

No one challenges the superior court's factual finding that "[f]ew life decisions could benefit more from consultation with supportive parents than a minor's decision to carry to term; the decision to abort, comparatively, involves far fewer enduring consequences." All pregnant minors, not just those seeking termination, may

---

[95]    (...continued)
be tolerated.").

[96]    We disagree with the dissent's contention that the issue before us is about parents' constitutional rights to parent their children, rather than the State's restriction of fundamental privacy rights in violation of the Alaska Constitution's equal protection guarantee. This appeal does not arise from a suit to enjoin the State from interfering with a parent's constitutional rights as a parent. This appeal arises from a suit to enjoin the State from restricting a minor's constitutional and statutory rights to pregnancy-related health care based solely on that minor's exercise of her fundamental privacy right to reproductive choice.

[97]    *Planned Parenthood II*, 171 P.3d at 583 (quoting *H.L. v. Matheson*, 450 U.S. 398, 410 (1981)).

[98]    *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972)).

need their parents' assistance and counsel when making reproductive choices; and parents who might counsel termination are as "entitled to the support of laws designed to aid [in the] discharge of [their] responsibility"[99] to guide their children as are parents who might counsel carrying to term.[100] Yet the Notification Law's effect is that only a minor seeking termination obtains parental guidance and only the parents of a minor seeking termination are given an opportunity to counsel their daughter about alternatives. But absent a compelling interest in limiting minors' pregnancy terminations and favoring their carrying to term — which the State does not assert — the State's compelling interest in fostering parental involvement extends equally to all pregnant minors and that interest's vindication does not justify treating the classes differently.

The State and the Sponsors contend that even if the importance of the State's asserted interest in parental involvement is equal for both classes, disparate treatment is justified because the State's interests eventually will be furthered for minors seeking to carry to term without parental notification, while furthering these interests for minors seeking termination requires parental notification. They contend that parents of a minor seeking to carry to term inevitably will learn of the pregnancy and then can

---

[99]    *Id.* (first alteration in original) (quoting *Bellotti v. Baird*, 443 U.S. 622, 639 (1979)).

[100]    The dissent — alone — asserts that unequal treatment is warranted solely by the moral difference in the pregnant minors' choices: "What similarity can there be between a decision to terminate life and a decision to preserve life?" Dissent at 72. This moral distinction is unsupported by any asserted State interest justifying the Notification Law, and it can lead only to a conclusion that the "wrong choice" launches a pregnant minor into a category of dissimilarity subjecting her to greater governmental interference than a pregnant minor who makes the "right choice." It is telling that the dissent's objection to interference with parental rights to participate in a minor's pregnancy-related health care is limited to the right to counsel against an abortion, and does not include the right to counsel against the more medically dangerous decision to carry to term.

further the asserted governmental interests by counseling and assisting the minor. They also contend that because an abortion can be kept secret, absent notification parents may not learn of it in time to provide counseling and assistance.[101]

Based on its evaluation of testimony regarding policies of Alaska hospitals, surgical centers, and health care providers, the superior court found that in Alaska an abortion generally is unavailable after about 14 weeks' gestation. After that point the decision to carry to term becomes essentially irreversible, and the opportunity to exercise reproductive choice is lost.[102] Trial testimony also reflected that it is possible for a pregnancy to be kept secret well past 14 weeks' gestation. Accordingly, parents learning of a minor's pregnancy after 14 weeks will have lost the opportunity to provide meaningful advice about reproductive choice; the State's interest in ensuring that parents have the opportunity to provide such advice thus is not necessarily furthered by the inevitability of the pregnancy becoming obvious.

---

[101] The State also argues that there is no opportunity to notify parents when minors choose to carry to term. *See* AS 25.20.025(a)(4) (permitting minors to receive medical treatment related to the "diagnosis, prevention, or treatment of pregnancy" without parental consent). But physicians could be statutorily required to notify parents of minors seeking any pregnancy-related medical care, just as the Notification Law requires notifying parents of minors seeking pregnancy termination. The relative wisdom of such a requirement, of course, is within the legislature's province, not ours, and we express no opinion whether such a requirement would survive a privacy-based constitutional challenge.

[102] The Sponsors argued in their briefing that carrying a child to term is not a choice because it is the natural result of pregnancy absent a decision to terminate. But at oral argument the Sponsors conceded that the mutually exclusive decision faced by a pregnant minor is carrying to term or termination. *Cf. State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 913 (Alaska 2001) ("[A] woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice.").

### ii.     Minors' physical and mental health

The State asserts an interest in protecting minors' physical and mental health.  But, again, we conclude that this general interest alone cannot justify disparate treatment based upon a pregnant minor's decision to terminate or carry to term.  The Sponsors more specifically argue that abortion entails unique medical risks not present when carrying to term, such as post-abortion complications, warranting parental involvement.  But the superior court found that abortion raises *fewer* health concerns for minors than does giving birth, that abortion is "quintessentially" and "extraordinarily" safe, and that "the majority consensus of American psychiatry is that abortion does not cause mental illness."[103]  The court noted that four doctors who had performed abortions in Alaska testified at the trial, and none indicated parental notification was medically

---

[103]     *See also  Gonzales v. Carhart*, 550 U.S. 124, 183 n.7 (2007) (Ginsburg, J., dissenting) ("[N]either the weight of the scientific evidence to date nor the observable reality of 33 years of legal abortion in the United States comports with the idea that having an abortion is any more dangerous to a woman's long-term mental health than delivering and parenting a child that she did not intend to have . . . ." (quoting Susan A. Cohen, *Abortion and Mental Health:  Myths and Realities*, 9 GUTTMACHER POL'Y REV. 8 (2006))); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 429 n.11 (1983) ("There is substantial evidence that developments in the past decade, particularly the development of a much safer method for performing second-trimester abortions . . . have extended the period in which abortions are *safer* than childbirth." (emphasis added)), *overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 882 (1992); *Beal v. Doe*, 432 U.S. 438, 445 (1977) (accepting assertion that "an early abortion poses less of a risk to the woman's health than childbirth"); *Roe v. Wade*, 410 U.S. 113, 149 (1973) ("Mortality rates for women undergoing early abortions, where the procedure is legal, appear to be as low as or lower than rates for normal childbirth."); *Isaacson v. Horne*, 716 F.3d 1213, 1224 (9th Cir. 2013) ("The Supreme Court has recognized that . . . improvements in medical technology will . . . push later in pregnancy the point at which abortion is safer than childbirth . . . ."); *cf. Casey*, 505 U.S. at 860 ("We have seen how time has overtaken some of *Roe*'s factual assumptions: advances in maternal health care allow for abortions safe to the mother later in pregnancy . . . .").

helpful; the doctors testified that minors are capable of providing their own medical histories and managing post-abortion care. The court also found that "[p]arental involvement is not required to manage complications, which are relatively rare and generally resolved by an obvious, immediate medical response." In short neither the Sponsors nor the State established that the medical risks of pregnancy termination justify the Notification Law's disparate treatment of pregnant minors.

The State also contends that its interest in protecting minors' health is implicated differently when minors seek to carry to term because parental notification discourages pregnant minors from obtaining prenatal medical care. The State asserts that it thus has a more "limited" health interest in minors seeking termination which justifies treating them differently from those seeking to carry to term. But if the specter of parental notification would discourage pregnant minors from seeking timely medical care consistent with their statutory and constitutionally protected fundamental privacy right to carry to term, then logically it also would discourage those seeking timely medical care consistent with their constitutionally protected fundamental privacy right to terminate. And because the superior court found that in Alaska an abortion generally is unavailable after about 14 weeks' gestation, time is of the essence. Absent a valid and compelling interest in discouraging termination and favoring carrying to term, an interest the State expressly denied at oral argument, we conclude that the State's interest in protecting the health of a minor seeking termination is equal to its interest in protecting the health of a minor seeking to carry to term.[104]

---

[104] In fact, the implication of the State's argument is that parental notification *hinders* the State's interest in protecting minors' health by discouraging and potentially delaying them from obtaining constitutionally protected medical treatment. If there is no medically or psychologically inferred difference between pregnant minors making reproductive choices, and if the State has no interest in which reproductive choice is

(continued...)

The concurring opinion echoes another State argument that "[p]regnant minors seeking to carry their pregnancies to term and pregnant minors seeking to terminate their pregnancies do not face the same choice" because "the pregnant minor who seeks to carry her pregnancy to term does not strictly need medical treatment" while "[t]he pregnant minor who seeks to terminate her pregnancy . . . cannot do so without medical treatment."[105] This arbitrary distinction is untethered to the State interests justifying the Notification Law and is inconsistent with the rationale for medical emancipation.

Until actually seeking pregnancy-related medical care the only difference between a minor seeking to terminate a pregnancy and a minor seeking to carry to term is the constitutionally protected *choice* each is making.[106] But once both minors seek pregnancy-related medical care, the Notification Law allows the minor seeking to carry to term to immediately consent to and receive treatment while requiring parental notification before the minor seeking termination may consent to and receive treatment. The statutory mandate that abortions be performed by doctors does not eliminate the justification for medical emancipation — encouraging minors to seek timely legal

---

[104]    (...continued)
made, under its own theory the Notification Law is *detrimental* to the State's compelling interest in protecting the health of minors seeking termination.

[105]    *See* AS 18.16.010(a)(1) ("An abortion may not be performed in this state unless . . . by a physician . . . .").

[106]    *Cf. Planned Parenthood of Alaska, Inc.*, 28 P.3d at 913 ("[A] woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice.").

medical care they otherwise might forgo or delay for fear of parental involvement[107] — and does not necessitate disparate treatment of the two groups.

### iii.  Sexual abuse prevention

We conclude that the State's interest in protecting minors from sexual abuse must be the same whether a pregnant minor seeks termination or seeks to carry to term. The superior court found that parental notification in and of itself would not meaningfully advance the State's interest in protecting minors from sexual abuse. And the State and the Sponsors point to no evidence that pregnant minors seeking termination are more likely to have been sexually abused — and therefore more in need of protection — than those seeking to carry to term. The Sponsors cite testimony that pregnant minors could be pressured by peers into seeking termination and speculate that the pressure could come from "those seek[ing] to hide illegal sexual activity." But the Sponsors cite no evidence that pregnant minors seeking termination are more likely to have been involved in "illegal sexual activity," are less likely or able to report sexual abuse, or are disproportionately more likely to have been pressured to seek termination — and therefore more in need of protection — than those seeking to carry to term.[108] No facts

---

[107]  As evidenced by the multitude of illicit abortions performed in this country before *Roe v. Wade*, restrictive abortion laws do not guarantee compliance. *See* 410 U.S. 113, 150 (1973) (recognizing "high mortality rates at illegal 'abortion mills' ").

[108]  Even were we to assume that reporting sexual abuse is correlated with maturity, we note that the superior court did not find that minors seeking termination were less mature than minors seeking to carry to term. To the contrary, the court noted that minors seeking termination may in some ways be more mature than those seeking to carry to term, including being more likely to have "high educational accomplishments or aspirations . . .[,] a greater ability to conceptualize the future, and a greater sense of control over their lives." The State and the Sponsors appeal this point, but they offer no evidence showing that pregnant minors seeking termination are less mature than those seeking to carry to term.

before us demonstrate that vindicating the State's compelling interest in protecting minors from sexual abuse justifies requiring that parents of minors seeking termination be notified without requiring the same for parents of minors seeking to carry to term. And neither the dissent nor the concurring opinion expressly disputes this conclusion.

### d. Conclusion

We must conclude that the State's asserted interests do not justify a distinction between pregnant minors seeking to terminate and those seeking to carry to term. Despite the factual difference between the two classes of pregnant minors, as a matter of law they are similarly situated with respect to the Notification Law. The Notification Law is under-inclusive because the governmental interests asserted in this case are implicated for all pregnant minors — as they face reproductive choices and as they live with their decisions — and the asserted justifications for disparate treatment based upon a minor's actual reproductive choice are unconvincing. The Notification Law's discriminatory barrier to those minors seeking to exercise their fundamental privacy right to terminate a pregnancy violates Alaska's equal protection guarantee.[109]

---

[109] We make another observation about the dissent, which — unlike all of the parties — contends that the Notification Law is not a real barrier to a mature minor's ability to obtain the medical care necessary to terminate a pregnancy. The dissent argues that as a practical matter the Notification Law is not a barrier to abortion access because: (1) only one parent has to be notified; (2) there is an exception for the protection of the minor's life; and (3) the "easily navigable" judicial bypass mechanism presents "an almost negligible hurdle." Dissent at 75-76. The obvious counter-argument would be that if the Notification Law really is not a barrier to medical treatment for a minor seeking to terminate a pregnancy, it really would not be a barrier to a minor seeking to carry to term. Yet the dissent acknowledges that for a minor seeking to carry to term, parental notification would be a potential barrier to access to prenatal care. It is virtually undisputed that a minor's access to any kind of pregnancy-related health care is burdened by parental involvement — there otherwise would be no need for medical emancipation statutes. The question here is whether — given its stated justifications — the State

(continued...)

Our decision today is not novel. Over 15 years ago the New Jersey Supreme Court considered whether a similar law violated that state's similar equal protection guarantee.[110] New Jersey's Constitution does not contain the explicit privacy guarantee that Alaska's Constitution does, but the court began its equal protection analysis by noting that New Jersey's Constitution — like Alaska's — "more expansive[ly]" protects "the right of privacy and its concomitant rights, including a woman's right to make certain fundamental choices," than does the United States. Constitution.[111] The court held that the parental notification law was subject to the "most exacting scrutiny" and that it "significantly burden[ed the rights of] unemancipated women seeking abortions."[112] The court reasoned that the law would create impediments preventing minors from exercising their constitutional rights, an unacceptable outcome "without substantial adequate justification for the classification."[113]

The New Jersey court considered each of the asserted governmental interests raised here by the State and the Sponsors — protecting minors from their own

---

[109]     (...continued)
constitutionally can burden access to only that pregnancy-related medical care related to terminating a pregnancy.

[110]     *See generally Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620 (N.J. 2000) (considering law requiring parental notification or judicial waiver before minor could obtain abortion).

[111]     *Id.* at 631-33; *see also Planned Parenthood II*, 171 P.3d 577, 581 (Alaska 2007) ("Because [Alaska's constitutionally protected] right to privacy is explicit, its protections are necessarily more robust and 'broader in scope' than those of the implied federal right to privacy." (quoting *Ravin v. State*, 537 P.3d 494, 515 (Alaska 1975) (Boochever, J., concurring))).

[112]     *Farmer*, 762 A.2d at 633.

[113]     *Id.* at 636.

immaturity, fostering family communications, and protecting parents' rights to raise their children — and determined that mandatory parental notification of planned pregnancy terminations did not further those interests.[114]  The court concluded that "the New Jersey Constitution does not permit the State to impose disparate and unjustifiable burdens on different classes of young women when fundamental constitutional rights hang in the balance."[115]  The court also made the following prescient statement, with which we agree:

> We emphasize that our decision in no way interferes with parents' protected interests, nor does it prevent pregnant minors or their physicians from notifying parents about a young woman's choice to terminate her pregnancy.  Simply, the effect of declaring the notification statute unconstitutional is to maintain the State's neutrality in respect of a minor's child-bearing decisions and a parent's interest in those decisions.  In effect, the State may not affirmatively tip the scale against the right to choose an abortion absent compelling reasons to do so.[116]

The dissent nonetheless contends we are out of the mainstream of judicial reasoning, pointing to other jurisdictions with either parental consent or parental notification laws in place.  But this contention is unsupported by any serious judicial reasoning tied to the required equal protection analysis under the Alaska Constitution: Relevant inquiries about each jurisdiction's laws are conspicuously absent.

---

[114]    *Id.* at 636-39.  The court noted evidence that cesarean sections, which did not have a parental notification requirement, were more dangerous for pregnant minors than were abortions and that minors seeking terminations for the most part were not immature.  *Id.* at 636-37.

[115]    *Id.* at 638.

[116]    *Id.* at 622.

Does that jurisdiction have the same broad fundamental privacy right for a minor's reproductive choice as conferred by the Alaska Constitution? The answer obviously must be "no" for any jurisdiction with a parental consent law or any jurisdiction with privacy or liberty rights co-extensive with those of the United States Constitution. Does the jurisdiction have the same equal protection guarantee as conferred by the Alaska Constitution? And if it does: (1) what weight does that jurisdiction give to a minor's privacy interest; (2) what are the government's asserted interests and what weight does that jurisdiction give them; and (3) what level of scrutiny does the jurisdiction apply? If the jurisdiction does not afford minors the same fundamental privacy right to reproductive choice as Alaska, or if the jurisdiction asserts more compelling governmental interests in limiting minors' abortion rights than does Alaska, then the weighing of interests — even under our own equal protection framework — likely would render a different result.[117]

The bare assertion that some other jurisdictions have parental consent or notification laws conflates different constitutional interests and protections and lends nothing to the required equal protection analysis under the Alaska Constitution. For

---

[117] We reiterate that our decision today is based on the limited State interests raised as the Notification Law's justification. The dissent criticizes that we have not identified exactly what is wrong with the Notification Law's language and that our decision means no notification law can ever be worded to pass equal protection muster in Alaska. Our response — again — is that the Notification Law's problem is not with wording, but rather with the lack of an acceptable justification for discriminating between pregnant minors based on how they exercise their fundamental privacy right to reproductive choice: The equal protection clause guarantees that the State may not discriminate between individuals with respect to a fundamental right unless a compelling governmental interest justifies the discrimination. *See supra* note 59 and accompanying text.

example, relying on *Planned Parenthood of Southeastern Pennsylvania v. Casey*,[118] the dissent asserts that the United States Supreme Court "has clearly explained" that a state may legitimately enact laws "designed to encourage a woman contemplating abortion to be informed regarding the effects that abortion may have on her and regarding alternatives to abortion."[119] The dissent therefore concludes that the State has a legitimate interest in the Notification Law that today's decision "trivializes."[120]

We do not disagree with the dissent's characterization of *Casey*. But *Casey* involved the balancing of a woman's liberty interest and a state interest in preserving unborn life *under the United States Constitution*.[121] In the case before us: (1) the fundamental right of privacy and the right of equal protection under *the Alaska Constitution* are at issue; (2) the State expressly disavowed any governmental interest in the ultimate reproductive choice made by pregnant minors, i.e., the State did not assert a compelling interest in preserving unborn life;[122] and (3) as discussed extensively above, the compelling State interests justifying the Notification Law do not include requiring pregnant minors to be informed of the "effects" of abortion or the alternatives to abortion, but rather include aiding parents to fulfill their parental responsibilities and

---

[118]    505 U.S. 833 (1992).

[119]    Dissent at 65.

[120]    Dissent at 66.

[121]    505 U.S. at 869-79.

[122]    Any balancing — under the Alaska Constitution — of a woman's fundamental privacy right of reproductive choice and a hypothetical government interest in limiting abortions and preserving unborn life is not before us. To avoid any future misunderstanding, we note that our *Casey* discussion here is not intended to be an explicit or implicit approval or disapproval of any position on such an abstract question.

protecting minors from risks to mental and physical health and from sexual abuse.[123] The parties did not cite *Casey* in their briefing, nor did they make the immaterial argument the dissent advances.

## B.    Privacy

Part II of the concurring opinion, to which three justices agree, concludes that a number of the Notification Law's provisions violate pregnant minors' constitutional privacy rights. But because the Notification Law cannot stand in the face of the Alaska Constitution's equal protection guarantee, it is unnecessary to decide — and it is not decided — whether invalidation of those provisions on the constitutional privacy ground renders the Notification Law unenforceable in its entirety.[124] We

---

[123]    Given the dissent's viewpoint on the morality of abortion and its emphasis on parents' constitutional rights to instill moral standards and religious beliefs in their children, the dissent apparently presumes, without regard to any of the stated justifications for the Notification Law, that parents would follow the dissent's moral code and try to persuade their pregnant daughters not to have abortions. Some probably would. Some probably would not. *Casey* itself is instructive in this regard:

> Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage. Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code.

505 U.S. at 849.

[124]    *Cf. Planned Parenthood II*, 171 P.3d 577, 581 n.21 (Alaska 2007) (declining to address equal protection claim after holding law unconstitutional on privacy grounds); *State, Dep't of Health & Soc. Servs. v. Valley Hosp. Ass'n*, 116 P.3d 580, 584 (Alaska 2005) (noting court has a "practice of reaching constitutional issues only when the case cannot be fairly decided on statutory or other grounds" (citing *Kenai Peninsula*

(continued...)

-42-                                                                7114

reiterate that our *Planned Parenthood II* conclusion indicating a parental notification law *might* satisfy Alaska's constitutional privacy standard does not necessarily mean that any particular parental notification law *will* do so. We also reiterate that today's equal protection decision is based on the limited State interests asserted to justify the Notification Law's discrimination against minors seeking to terminate a pregnancy, and that a similar law with different supporting justifications would require a new equal protection analysis.

### C.     Cross-Appeal

In light of our ruling, we do not need to reach the issues raised in the State's and the Sponsors' cross-appeals.

## V.     CONCLUSION

The Parental Notification Law violates the Alaska Constitution's equal protection guarantee. We REVERSE the superior court's decision to the extent that it upholds the Parental Notification Law, and we REMAND for further proceedings, including entry of judgment consistent with our decision.

---

[124]     (...continued)
*Fisherman's Coop. Ass'n v. State*, 628 P.2d 897, 908 (Alaska 1981))).

FABE, Chief Justice, concurring; MAASSEN, Justice, and BOLGER, Justice, joining only in Part II of the concurrence.

I disagree with the court's analysis and conclusion that the Parental Notification Law violates the guarantee of equal protection. But because this parental notification scheme violates the fundamental right to privacy, I concur with the court's judgment. A law that burdens reproductive choice "must be subjected to strict scrutiny and can only survive review if it advances a compelling state interest using the least restrictive means of achieving that interest."[1] This law does not achieve its goals using the least restrictive means; on the contrary, it is one of the most restrictive parental notification laws in the country. I believe that the Alaska Constitution permits a parental notification law, but not one that contains provisions that are among the most restrictive of any state's notification laws. Thus, I agree with the court that this law violates the Alaska Constitution.

## I.  RIGHT TO PRIVACY, RATHER THAN EQUAL PROTECTION, IS THE APPROPRIATE CONSTITUTIONAL FRAMEWORK FOR THIS LAW.

We have held "that reproductive rights are fundamental, and that they are encompassed within the right to privacy expressed in article I, section 22 of the Alaska Constitution."[2] Since our first decision on this issue, we have most often analyzed challenges to laws that relate to a woman's right to reproductive choice as matters of the constitutional right to privacy.[3] I continue to view the right to privacy as the appropriate

---

[1]     *State v. Planned Parenthood of Alaska* (*Planned Parenthood II*), 171 P.3d 577, 582 (Alaska 2007).

[2]     *Valley Hosp. Ass'n v. Mat-Su Coalition For Choice*, 948 P.2d 963, 969 (Alaska 1997).

[3]     *See Planned Parenthood II*, 171 P.3d at 581 n.21 ("Because we conclude
(continued...)

-44-                                             7114

lens through which to analyze such laws, including the parental notification statute at issue in this case.

When fundamental rights are at issue, our right-to-privacy analysis closely resembles our equal protection analysis. Both modes of analysis require identification of a compelling governmental interest, advanced by the least restrictive means.[4] They differ in what aspect of a law is subjected to this strict review: its infringement of the fundamental right or its discriminatory treatment of the fundamental rights of two different groups. In my view the notification law infringes on a minor's fundamental right to reproductive choice in a manner that is not the least restrictive means of accomplishing the government's compelling interests, but it does not treat similarly situated groups dissimilarly.

As we have recognized, the State has compelling interests in "protecting minors from their own immaturity and aiding parents in fulfilling their parental

_____

[3]     (...continued)
that the [Parental Consent Act] violates the right to privacy under the Alaska Constitution, we need not address the plaintiffs' arguments that the Act also violates the equal protection clause or that the superior court erred in interpreting the Act to include a medical emergency exception."); *State v. Planned Parenthood of Alaska* (*Planned Parenthood I*), 35 P.3d 30, 41, 45 (Alaska 2001) (holding that "[t]o justify the [Parental Consent Act's] restriction of a minor's right to terminate a pregnancy, . . . the state must establish a compelling interest in restricting the minor's right to privacy" and declining to decide the equal protection question until further evidentiary hearings were held); *Valley Hosp.*, 948 P.2d at 969 (explaining that "reproductive rights are . . . encompassed within the right to privacy expressed in . . . the Alaska Constitution"). *But see State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska*, 28 P.3d 904, 908-13 (Alaska 2001) (applying equal protection analysis in striking down a statute that denied Medicaid funding for medically necessary abortions).

[4]     *See, e.g.*, *Planned Parenthood II*, 171 P.3d at 581 (fundamental right to privacy); *Titus v. State, Dep't of Admin., Div. of Motor Vehicles*, 305 P.3d 1271, 1278 (Alaska 2013) (equal protection).

responsibilities."[5] The court concludes that the State's interest in aiding parents in fulfilling their parental responsibilities does not require different treatment of pregnant minors seeking to carry their pregnancies to term and pregnant minors seeking to terminate their pregnancies. I agree with the court's legal framework for analyzing this question. But I believe that those groups are not similarly situated with regard to the State's broad interest in protecting minors from their own immaturity.

"In order to determine whether differently treated groups are similarly situated, we look to the [S]tate's reasons for treating the groups differently."[6] The State's reasons are discernable from the full context of Alaska's medical notification and consent laws for minors. Under Alaska law, minors generally cannot consent to medical care.[7] There is, however, an exception "for diagnosis, prevention or treatment of pregnancy, and for diagnosis and treatment of venereal disease."[8] This exception encourages minors not to delay or forgo medical assistance that they might hesitate to discuss with their parents. The Parental Notification Law, then, is an exception to the exception: It requires pregnant minors seeking to terminate their pregnancies to notify their parents or seek a judicial bypass before doing so.

Pregnant minors seeking to carry their pregnancies to term and pregnant minors seeking to terminate their pregnancies do not face the same choice about whether to seek medical assistance. Although she would surely be wise to visit a doctor, the pregnant minor who seeks to carry her pregnancy to term does not necessarily need medical treatment to achieve her aims. The pregnant minor who seeks to terminate her

---

[5]     *Planned Parenthood II*, 171 P.3d at 582.

[6]     *Pub. Emps. Ret. Sys. v. Gallant*, 153 P.3d 346, 349 (Alaska 2007).

[7]     *See* AS 25.20.025.

[8]     AS 25.20.025(a)(4).

pregnancy, in contrast, cannot do so without medical treatment.[9] As the superior court noted, "once a minor elects an imminent abortion, the core rationale underpinning medical emancipation no longer applies to her; she no longer requires encouragement to see a doctor to protect her own health or that of her fetus." Instead, she *must* seek medical treatment, and the risk of delay or avoidance that animates the exception to the general parental consent requirement for "diagnosis, prevention or treatment of pregnancy, and for diagnosis and treatment of venereal disease" is qualitatively different.

The State may not discriminate between women in order to influence their reproductive choices.[10] And carrying a pregnancy to term may entail risks to a minor's physical and mental health that are equal to the corresponding risks from terminating a pregnancy. But pregnant minors seeking to carry their pregnancies to term and pregnant minors seeking to terminate their pregnancies face significantly different incentives to delay or avoid medical assistance and significantly different risks from that delay or avoidance. Thus, an equal protection analysis of the Parental Notification Law should not treat these groups as similarly situated.

Moreover, in *Planned Parenthood II* "we determine[d] that the constitution permits a statutory scheme which ensures that parents are notified so that they can be engaged in their daughters' important decisions" in matters related to pregnancy.[11] By holding up parental notification laws as a less restrictive alternative to the parental consent law then at issue, we indicated that at least some such laws would pass

---

[9]    *See* AS 18.16.010(a) ("An abortion may not be performed in this state unless . . . by a physician . . . in a hospital or other facility approved for the purpose.").

[10]    *See State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska*, 28 P.3d 904, 913 (Alaska 2001).

[11]    171 P.3d 577, 579 (Alaska 2007).

constitutional muster.[12]  But the court today calls that determination into question.  In order to give similar treatment to minors seeking to carry to term and minors seeking to terminate their pregnancy — and thus to survive the court's equal protection analysis — a notification statute would have to require parental notice of *all* pregnancy-related care.  Yet none of the notification statutes we cited as alternatives in *Planned Parenthood II* require such universal notice for all pregnant minors, and thus they would likely fail under the court's equal protection analysis.[13]  For these reasons, I respectfully disagree with the court's application of our equal protection doctrine here.  Instead, I believe that the appropriate lens through which to analyze the parental notification law at issue in this case is the right to privacy, and I turn to that analysis next.

---

[12]      Although the parties raised the equal protection question in that case, we determined that we did not need to reach it.  *See id.* at 581 n.21.  But by explaining that "the constitution permits" a parental notification law, we strongly suggested that such a law might pass constitutional muster more broadly, as long as it struck "the proper constitutional balance between the State's compelling interests and a minor's fundamental right to privacy."  *Id.* at 579.

[13]      *See id.* at 583 n.40; DEL. CODE ANN. tit. 24, § 1783 (2015); FLA. STAT. § 390.01114 (2015); GA. CODE ANN. § 15-11-682 (2015); 750 ILL. COMP. STAT. 70/15 (2015); IOWA CODE § 135L.3 (2015); MD. CODE ANN., HEALTH-GEN. § 20-103 (West 2015); MINN. STAT. § 144.343 (2015); N.H. REV. STAT. ANN. § 132:33 (2015); S.D. CODIFIED LAWS § 34-23A-7 (2015); W. VA. CODE § 16-2F-3 (2015); *see also* COLO. REV. STAT. § 12-37.5-104 (2015), *invalidated by Planned Parenthood of the Rocky Mountains Servs., Corp. v. Owens*, 287 F.3d 910 (10th Cir. 2002) (holding the statute unconstitutional because it failed to include an exception for the health of the pregnant minor).

## II. THE LAW VIOLATES THE RIGHT TO PRIVACY.

The right to privacy, enshrined in the Alaska Constitution,[14] protects the fundamental right to reproductive choice for minors as well as adults.[15] A law that burdens this interest "must be subjected to strict scrutiny and can only survive review if it advances a compelling state interest using the least restrictive means of achieving that interest."[16]

In *Planned Parenthood II* we held that a parental consent law failed strict scrutiny by prohibiting a pregnant minor from terminating her pregnancy without first obtaining the consent of her parents, unless she had been granted a judicial bypass.[17] That parental consent law was not the least restrictive means of achieving the State's interests because "[t]here exists a less burdensome and widely used means of actively involving parents in their minor children's abortion decisions: parental notification."[18] This does not mean, however, that any and all parental notification laws comport with strict scrutiny; as we recognized, "parental notification statutes undoubtedly burden the privacy rights of minors."[19] These laws must still achieve their aims without any unnecessary burden on minors' privacy rights; that is, they must use the least restrictive means of achieving the State's compelling interests. The parental notification law at issue here does not achieve its goals using the least restrictive means: In fact, it is one

---

[14] *See* Alaska Const. art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed.").

[15] *See Planned Parenthood II*, 171 P.3d at 581-82.

[16] *Id.* at 582.

[17] *See id.* at 583.

[18] *Id.* at 579.

[19] *Id.* at 584.

of the most restrictive laws of its type in the country. The fact that other states achieve the same interests by significantly less restrictive means indicates that Alaska's Parental Notification Law is not narrowly tailored.

When undertaking a review of this statute as a whole, it becomes evident that the law's methods are not the least restrictive means available to advance the State's recognized compelling interests. First, the standard of proof for a court exemption from the notice requirement is clear and convincing evidence — the strictest standard of proof in the country for any such law. Although the superior court enjoined this aspect of the statute, the State and its co-appellants appeal that ruling, which requires us to address whether the standard of proof survives strict scrutiny. The law recognizes three grounds for judicial bypass: (1) sufficient maturity; (2) physical, sexual, or repeated emotional abuse by the parent or guardian; and (3) that parental consent[20] is not in the minor's best interest.[21] Each of these must be proved by clear and convincing evidence.[22] Only three other notice states require a minor to prove her sufficient maturity by clear and convincing evidence;[23] only two require her to prove that notice would not be in her best interest by that standard.[24] And not one of the six states that provide for bypass on

---

[20]    This reference to parental consent appears to be an anomaly in the statute, in which parental notice otherwise replaced parental consent.

[21]    AS 18.16.030(b)(4)(A)-(B).

[22]    AS 18.16.030(e)-(f).

[23]    *See* FLA. STAT. § 390.01114(4)(c); S.D. CODIFIED LAWS § 34-23A-7; *see also* COLO. REV. STAT. § 12-37.5-107(2)(a), *invalidated by Planned Parenthood of the Rocky Mountains Servs., Corp. v. Owens*, 287 F.3d 910 (10th Cir. 2002).

[24]    *See* FLA. STAT. § 390.01114(4)(d); S.D. CODIFIED LAWS § 34-23A-7. Florida has a separate abuse ground for bypass that need only be proved by a

(continued...)

grounds of abuse (rather than folding evidence of abuse into the best interest inquiry) requires proof by clear and convincing evidence.[25]

The standard of proof can have a real, significant impact on these cases: As observed in the child custody context, "in close cases, a higher standard of proof will place the risk of erroneous factfinding on the child."[26] Here, that risk is acute. The "clear and convincing" requirement in the Parental Notification Law would require that a trial court deny a judicial bypass to some minors even if it finds that they are *likely* (though not clearly and convincingly) sufficiently mature, or victims of abuse, or best served by a bypass. The high standard of proof yields a particularly stark outcome in the case of a minor who has been abused by a parent or guardian, where a trial judge would be required to deny judicial bypass for a pregnant minor who was likely abused by her own parent but cannot provide sufficient evidence to satisfy the clear and convincing

---

[24] (...continued)
preponderance of the evidence, limiting the severity of this standard of proof for the best interest analysis. *See* FLA. STAT. § 390.01114(4)(d).

[25] *See* FLA. STAT. § 390.01114(4)(d) (no notice required if court finds abuse by preponderance of the evidence); 750 ILL. COMP. STAT. 70/20(4) (no notice required if minor declares abuse or neglect to physician in writing); IOWA CODE § 135L.3(3)(m)(4)-(5) (no notice required if minor declares abuse to physician and it has been previously reported to authorities); MD. CODE ANN., HEALTH-GEN. § 20-103(c)(1)(i) (no notice required if physician judges that notice may lead to abuse); MINN. STAT. § 144.343(4)(c) (no notice required if minor declares abuse or neglect to physician, who must then report abuse); *see also* COLO. REV. STAT. § 12-37.5-105(1)(b) (no notice required if minor declares abuse or neglect to physician), *invalidated by Planned Parenthood of the Rocky Mountains Servs.*, 287 F.3d 910.

[26] *Evans v. McTaggart*, 88 P.3d 1078, 1095 (Alaska 2004) (Fabe, C.J., dissenting).

standard.[27]  It may be especially hard for a minor to meet this standard of proof in such familial abuse cases, where "a child's report of a parent's [abusive] conduct is often the primary source of evidence."[28]  As in the child custody context where this issue has previously been discussed, "[e]ven if it is not debatable that the parent's actions are [abusive], the lack of corroboration — particularly in light of a parent's denial — may mean that the child's report, although providing a preponderance of the evidence, will fail to satisfy the clear and convincing standard."[29]  In such a case, the trial court would be required to deny judicial bypass.  Given the balance of rights and interests involved, this outcome can hardly be viewed as the least restrictive means of achieving a compelling state interest.  Thus the burden of proof for the judicial bypass procedure fails strict scrutiny.

Second, the only other way for an abused minor to avoid the parental notification requirement is for the abuse to be documented in a notarized statement signed by a witness who has "personal knowledge of the abuse" and who is a law enforcement officer, a Health and Social Services investigator, or a grandparent, stepparent, or sibling over the age of 21.[30]  Here again, the requirements of the law clash with the realities of a pregnant minor who has been abused by a parent yet must seek corroborating evidence from her own family or from a government official to prove it.  Because much familial abuse is not susceptible to outside witness, or may only be witnessed by another family member who is not willing to testify, in practice this option

---

[27]    AS 18.16.030(b)(4)(B), (f).

[28]    *Evans*, 88 P.3d at 1097 (Fabe, C.J., dissenting).

[29]    *Id.*

[30]    AS 18.16.020(a)(4).

will likely be foreclosed to many of the young women it is designed to protect.[31] Requiring a signed and notarized declaration from a witness, therefore, unduly restricts these minors' rights. Nor does the judicial bypass — even if it were not overly restrictive itself — cure the unreasonably restrictive nature of this provision. As we held in *Planned Parenthood II*, "the inclusion of [a] judicial bypass procedure does not reduce the restrictiveness" of the provision in question.[32] So for a daughter who was abused by a parent or guardian — perhaps the very person she is required to notify under this law — neither the judicial bypass nor the witnessed declaration provides a constitutionally adequate alternative to the law's parental notification requirement.

Third, the Parental Notification Law burdens physicians and all involved families by imposing verification requirements that have no analogue in the notification laws of other states. Most of the 11 states other than Alaska that have notification laws do not specify how the identity of a notice recipient is to be established, and those that do simply require that the recipient produce government-issued identification[33] or that the physician record the number dialed and the date and time of the phone call.[34] In

---

[31] As the superior court explained, witnesses at trial testified that the opportunity for exemption by means of a witnessed affidavit is "largely illusory" because it requires the minor to disclose her pregnancy to a family member who witnessed the abuse but "who has to that moment remained silent." And as the superior court recognized, "[i]t is unlikely that an adolescent would recall the name of an OCS worker or a police officer who was involved with the family at a prior time, or will desire to reveal her pregnancy to such a stranger." Therefore, the superior court concluded, "only a small percentage of abuse victims will avail themselves of the [law's] affidavit-of-abuse exception to notice."

[32] 171 P.3d 577, 584 (Alaska 2007).

[33] *See* GA. CODE ANN. §§ 15-11-681(2); 15-11-682(a)(1)(A).

[34] *See* FLA. STAT. § 390.01114(3)(a).

contrast, Alaska's Parental Notification Law imposes a burden that is not found in any other state's statute by requiring that any in-person notice recipient "show government-issued identification along with additional documentation of the person's relationship to the minor,"[35] and that the physician delivering notice by phone "attempt[] to verify through a review of published telephone directories that the number to be dialed is that of the minor's parent, legal guardian, or custodian, and ask[] questions of the person to verify that the person's relationship to the minor is that of parent, legal guardian, or custodian."[36] As the superior court recognized, the additional documentation requirement for in-person notice "clashes with the realities of rural Alaska." These documentation requirements also mean that a doctor has not fulfilled the statute's notice requirement even after giving in-person notice to a parent who is fully aware of a daughter's decision to terminate her pregnancy but has misplaced her birth certificate. Furthermore, the law requires the physician to deliver notice himself or herself rather than permitting delegation of this responsibility to medical office staff.[37] This is a far more burdensome approach than that selected by other states, the vast majority of which statutorily allow someone other than the physician to deliver notice.[38]

---

[35] AS 18.16.020(b)(1).

[36] AS 18.16.020(b)(2).

[37] AS 18.16.020(b). The State and its co-appellants do not appeal the superior court's injunction against the law's requirement that the physician personally deliver notice in all cases, but we nonetheless review this provision in reviewing the constitutionality of the statute as a whole.

[38] *See* DEL. CODE ANN. tit. 24, § 1783(1) (notice may be provided by, among others, an agent of the physician); GA. CODE ANN. § 15-11-682(a)(1)(B) (notice may be provided by the physician's qualified agent); 750 ILL. COMP. STAT. 70/15 (notice may be provided by the physician's agent); MINN. STAT. § 144.343(2)(a) (same); N.H. REV.
(continued...)

Thus, this parental notification scheme is not the least restrictive means of advancing the State's compelling interests.

Fourth, the statute's imposition of civil liability for all violations of the Parental Notification Law is more punitive and chilling than penalties in equivalent notification laws in other states. Again, although the superior court enjoined the operation of this portion of the statute, the State and its co-appellants argue that the injunction against it should be lifted. Of the five states that make physicians civilly liable for failure to provide notice, two require that the physician's failure be "willful."[39] Only one of the remaining three discusses punitive damages, and then only to clarify that the statute does not specifically prohibit such damages.[40] In contrast, Alaska's Parental Notification Law explicitly allows punitive damages against physicians without requiring any finding of willfulness.[41] This is yet another way in which this statute is an outlier, at odds with our constitution's express recognition of the fundamental right to privacy and its requirement that any burden on that right must be the least restrictive means of achieving a compelling government interest.

---

[38]    (...continued)
STAT. ANN. § 132:33(II) (same); S.D. CODIFIED LAWS § 34-23A-7 (same); W. VA. CODE § 16-2F-3(a) (requirement met if "physician has given [notice] or caused [notice] to be given"); *see also* COLO. REV. STAT. § 12-37.5-104(1)(a) (notice may be provided by, among others, any person older than 18 who is not related to the minor), *invalidated by Planned Parenthood of the Rocky Mountains Servs., Corp. v. Owens*, 287 F.3d 910 (10th Cir. 2002).

[39]    *See* S.D. CODIFIED LAWS § 34-23A-22; *see also* COLO. REV. STAT. § 12-37.5-106(1), *invalidated by Planned Parenthood of the Rocky Mountains Servs.*, 287 F.3d 910.

[40]    *See* DEL. CODE ANN. tit. 24, § 1789B; *see also* MINN. STAT. § 144.343(5) (establishing civil liability but not damages); N.H. REV. STAT. ANN. § 132:35 (same).

[41]    *See* AS 18.16.010(e).

Fifth, I cannot conclude that the specter of a felony conviction and five years imprisonment for any person who knowingly violates the notice requirement[42] is narrowly tailored to advance a compelling state interest. Four notification states have no criminal penalty attached to their notification laws.[43] Another six make violation a misdemeanor.[44] Only one makes it a felony, and even there a violation of the notice requirement is the lowest class of felony, with a maximum of two years imprisonment.[45] The Parental Notification Law's criminal penalty is by far the most severe of any state, demonstrating that it is not the least restrictive means of enforcing a notification law. And although the Parental Notification Law fails the least-restrictive-means analysis even without reference to its criminal penalties, these penalties are a further indication that the law's provisions are not narrowly tailored.

Furthermore, the law as originally adopted contained still more elements that fail the least-restrictive-means test. For example, the law as enacted allowed constructive notice to be mailed only after 24 hours of failed attempts at telephonic notice, and it applied even when medical conditions rendered fetal death inevitable.[46]

---

[42] *See* AS 18.16.010(c).

[43] *See* FLA. STAT. § 390.01114; 750 ILL. COMP. STAT. 70/40 (no criminal penalty for physicians, misdemeanor for unauthorized signing of waiver of notice); MD. CODE ANN., HEALTH-GEN. § 20-103 (no criminal penalty for physicians); *see also* COLO. REV. STAT. § 12-37.5-106, *invalidated by Planned Parenthood of the Rocky Mountains Servs.*, 287 F.3d 910.

[44] *See* DEL. CODE ANN. tit. 24, § 1789; GA. CODE ANN. § 15-11-688; IOWA CODE § 135L.3(3)(n); MINN. STAT. § 144.343(5); N.H. REV. STAT. ANN. § 132:35; W. VA. CODE § 16-2F-8.

[45] *See* S.D. CODIFIED LAWS §§ 22-17-5, 22-6-1.

[46] *See* AS 18.16.020(c). Although the superior court construed the statute to

(continued...)

These aspects of the law further demonstrate that the statutory scheme as designed was one of the most restrictive and burdensome in the country.

And not only does this law achieve its aims by overly restrictive methods, it also adopts an overly expansive scope by sweeping in minors whose maturity in reproductive choices the legislature has formerly recognized. The parental consent act we considered in *Planned Parenthood II* applied only to minors 16 and younger.[47] Both the court and the dissent in that case noted that this represented "a serious effort to narrowly tailor the scope of the [Parental Consent Act]"[48] by excluding "the population of teenage girls most likely competent, by virtue of maturity and experience, to make the decision regarding abortion without adult assistance."[49] The notification law at issue in this appeal does not demonstrate a serious effort at narrow tailoring. Indeed, while a 17-year-old living independently from her parents may make her own, uninfluenced decisions about all other medical questions,[50] the Parental Notification Law would not allow her the same independence with regard to her reproductive choice,[51] a decision

---

[46]    (...continued)
avoid these two particular problems, their inclusion in the original statutory text provides yet another indication that the law as enacted did not use the least restrictive means available.

[47]    *See Planned Parenthood II*, 171 P.3d 577, 583 (Alaska 2007).

[48]    *Id.*

[49]    *Id.* at 587 (Carpeneti, J., dissenting).

[50]    *See* AS 25.20.025(a)(1) ("[A] minor who is living apart from the minor's parents or legal guardian and who is managing the minor's own financial affairs, regardless of the source or extent of income, may give consent for medical and dental services.").

[51]    AS 18.16.010(a)(3) (parental notification law applies to all "pregnant,
(continued...)

protected by her fundamental right to privacy. The fact that the law reaches the minors least likely to need protection from their own immaturity again indicates that its scope is not narrowly tailored. Although this list of the ways that the law's methods infringe on a minor's constitutional right to privacy is not meant to be exhaustive, it is more than adequate to establish that the Parental Notification Law cannot stand.

## III. THE UNCONSTITUTIONAL PROVISIONS ARE NOT SEVERABLE.

The law's provisions that violate the right to privacy affect virtually every aspect of the notification process. From the notification mechanism, to the law's scope, to its civil and criminal penalties, to the judicial bypass procedure, and even to the provision excusing notice in the case of an abused minor, these constitutionally intrusive provisions reach the point where "their invalidation so undermines the structure of the Act as a whole that the entire Act must fall."[52] Our severability doctrine rests on the test set out in *Lynden Transport*, which "asks (1) whether 'legal effect can be given' to the severed statute and (2) if 'the legislature intended the provision to stand' in the event other provisions were struck down."[53] We later explained that "*Lynden Transport* is the test for severability of enacted measures, whatever their source" — including for laws adopted by a ballot measure, like the Parental Notification Law.[54] I believe that the remaining, constitutionally valid portions of the Parental Notification Law would not satisfy this test.

---

[51]    (...continued)
unmarried, unemancipated wom[e]n under 18 years of age"); AS 09.55.590 (establishing judicial process by which a minor can be emancipated).

[52]    *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 633 (Alaska 1999).

[53]    *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 209 (Alaska 2007) (quoting *Lynden Transp., Inc. v. State*, 532 P.2d 700, 713 (Alaska 1975)).

[54]    *Id.* at 209-10.

The "legislative intent" prong of our severability test incorporates the widely accepted principle that "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.' "[55] In assessing legislative intent, our recent cases have considered whether the act in question contained a severability clause, reading such a clause as the primary "indicat[ion] that the legislature intended the remainder of the Act to stand if part of it were invalidated."[56] In both *Alaskans for a Common Language v. Kritz* and *State v. Alaska Civil Liberties Union*, the presence of a severability clause was central to our conclusion that the remaining portions of the acts could stand alone after severing the constitutionally invalid portions. Other state high courts and the U.S. Supreme Court have taken a similar approach to severability clauses, generally removing only the challenged portions if a severability clause exists but striking the entire law in the absence of such a clause.[57]

---

[55] *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (quoting *Califano v. Westcott*, 443 U.S. 76, 94 (1979)) (Powell, J., concurring in part and dissenting in part).

[56] *Alaskans for a Common Language*, 170 P.3d at 209 (quoting *Alaska Civil Liberties Union*, 978 P.2d at 633).

[57] *E.g.*, *Ayotte*, 546 U.S. at 331 (allowing certain portions of the challenged law to stand in part because "the Act contains a severability clause"); *Ruiz v. Hull*, 957 P.2d 984, 1002 (Ariz. 1998) ("[W]e decline to sever the invalid portions of the Amendment . . . because [it] does not contain a severability clause and . . . because the record is devoid of evidence that the voters would have enacted such a rewritten and essentially meaningless amendment."); *Dallman v. Ritter*, 225 P.3d 610, 638 (Colo. 2010) (holding that, when assessing "the autonomy of the portions remaining" and "the intent of the enacting legislative body," the court "must take into account any severability clause, which demonstrates the lawmaking body's intent that the law remain largely in force despite particular, limited infirmities").

The Parental Notification Law did not contain a severability clause. The omission of a severability clause is particularly illuminating here, given that the initiative's sponsors had reason to know, based on this law's history,[58] that the enacted law might face a challenge on constitutional grounds. I do not suggest that a severability clause is dispositive: Indeed, the *presence* of a severability clause does not necessarily mean that a statute's constitutionally invalid provisions are severable from the remainder of the statutory scheme.[59] But here the absence of a severability clause weighs in favor of finding that the invalid portions of the law are not severable and thus that the entire act must fall.

Moreover, we have held that a law will fail the legislative intent prong if the remainder of the law is not "independent and complete in itself" so that we may presume the remaining, valid portions were intended to stand on their own in the event that the other portions were struck down.[60] Here, the constitutional infirmities described above are pervasive — they touch nearly every aspect of the Parental Notification Law. If the portions of the law that violate the right to privacy were removed, it would mean eliminating key elements of the notification requirement, the civil and criminal penalties for its violation, the judicial bypass procedure, and the alternative provision for documented abuse of the pregnant minor. The law cannot be considered "independent

---

[58]     *Planned Parenthood II*, 171 P.3d 577 (Alaska 2007); *Planned Parenthood I*, 35 P.3d 30 (Alaska 2001).

[59]     *See, e.g.*, *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135, 139 (9th Cir. 1980), *aff'd*, 454 U.S. 1022 (1981) (holding that the entire statute must fall despite the inclusion of a severability clause).

[60]     *Alaskans for a Common Language*, 170 P.3d at 212 (quoting *Sonneman v. Hickel*, 836 P.2d 936, 941 (Alaska 1992)).

and complete in itself"[61] in the absence of all these provisions. Thus, under our prior case law, we cannot presume the remaining portions were intended to stand on their own. The law therefore fails the legislative intent prong of the *Lynden* test.

Next, although the failure of one *Lynden* prong is sufficient to conclude that the invalid portions cannot be severed, in this case the statute likely fails the "legal effect" prong of the test as well. Specifically, I have serious doubt that "legal effect can be given"[62] to this law once critical aspects of virtually all the core provisions are found unconstitutional. As other courts engaging in similar severability analyses have noted, the challenged portions of a statute may "represent a vital part of the statutory scheme," such that altering or removing them "would create a program quite different from the one the people actually adopted."[63] The Ninth Circuit, for instance, has held that constitutionally flawed provisions of a law cannot be severed when doing so "would essentially eviscerate the statute."[64]

The Supreme Court of Colorado undertook a similar analysis in a recent case challenging an amendment to the state constitution, which limited certain types of political campaign contributions, and which had been passed by voter initiative.[65] After striking the invalid provisions, the court explained, the entire law must fall "if what remains is so incomplete or riddled with omissions that it cannot be salvaged as a

---

[61]    *Id.*

[62]    *Lynden Transp., Inc. v. State*, 532 P.2d 700, 713 (Alaska 1975).

[63]    *Spokane Arcades, Inc.*, 631 F.2d at 139 (internal alterations omitted) (quoting *Sloan v. Lemon*, 413 U.S. 825, 834 (1973)).

[64]    *Id.*

[65]    *Dallman v. Ritter*, 225 P.3d 610, 616-17, 638-40 (Colo. 2010).

meaningful legislative enactment."[66] Emphasizing that a court "cannot rewrite or reshape a law in order to maintain its constitutionality,"[67] the court ultimately explained that it was required to "strike the entire law" because "its purpose [was] so eviscerated by necessary nullifications that the original law cannot stand in any working order."[68]

Similarly, the pervasive constitutional infirmities affect every core provision of the Parental Notification Law. The unconstitutional provisions described above include elements of the procedure that a doctor must follow under the notification requirement, the age cutoff for the requirement, the civil and criminal penalties for violating it, the burden of proof for the judicial bypass — which applies to all three potential bypass options — and the requirements for the alternative process that an abused minor may use. In short, the constitutional infirmities touch all four pillars of the statutory framework under the "notice or consent" provision at issue in this case.[69] Without these pillars, the law cannot stand.

I therefore believe that the constitutionally impermissible provisions "represent a vital part of the statutory scheme" and that severing them "would essentially eviscerate the statute."[70] Attempting to patch together a constitutional statute from the remaining portions of the law would effectively be an exercise in rewriting the law. Our

---

[66] *Id.* at 639 (alterations omitted) (quoting *City of Lakewood v. Colfax Unlimited Ass'n*, 634 P.2d 52, 69 (Colo. 1981)).

[67] *Id.* (citing *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006)).

[68] *Id.* (citing *City of Lakewood*, 634 P.2d at 70).

[69] AS 18.16.020(a)(1)-(4).

[70] *See Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135, 139 (9th Cir. 1980), *aff'd*, 454 U.S. 1022 (1981).

own cases,[71] as well as similar approaches used by other courts,[72] caution against wholesale revision of statutory language in this manner. Nor can we simply modify the constitutionally problematic provisions as the dissent suggests,[73] because we must refrain from this "quintessentially legislative work" of "rewriting [the] law to conform it to constitutional requirements."[74] Thus, at the point where we would be essentially rewriting every major provision of a statute, the entire statute instead must be struck down. Here, where the unconstitutional portions of the law affect every element of the statutory scheme, the law reaches the point where it is so riddled with constitutional holes that it cannot be salvaged.

Accordingly, because the Parental Notification Law fails both prongs of the *Lynden* test, I would conclude that the constitutionally invalid portions of the law are not severable from the remaining provisions, and thus the entire law must fall. I therefore would hold that the Parental Notification Law impermissibly violates a minor's fundamental right to privacy because it does not advance the compelling state interest by

---

[71]     *See, e.g.*, *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co.*, 262 P.3d 593, 598 (Alaska 2011) (declining to alter the meaning of a statute even when it was likely misdrafted).

[72]     *Ayotte*, 546 U.S. at 329-30 (noting that, when deciding whether to sever a portion of a statute, courts should refrain from rewriting the law in question); *Ruiz v. Hull*, 957 P.2d 984, 1002 (Ariz. 1998) (declining to perform "judicial surgery" because it would leave a "rewritten and essentially meaningless [law]"); *Dallman*, 225 P.3d at 638 ("[W]e cannot rewrite or actively reshape a law in order to maintain its constitutionality." (citing *Ayotte*, 546 U.S. at 330)).

[73]     Dissent at 90.

[74]     *Ayotte*, 546 U.S. at 329 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)).

the least restrictive means, and I concur with the court's judgment that the law must be struck down as violating the Alaska Constitution.

STOWERS, Justice, dissenting.

I dissent from today's opinion because it unjustifiably departs from our earlier approval of parental notification in *Planned Parenthood II*,[1] misapplies our equal protection case law by comparing two groups that are not similarly situated, and fails to consider how other states have handled similar questions related to parental notification laws. I also disagree with the concurring opinion that the Parental Notification Law violates the Alaska Constitution's Privacy Clause. But, for argument's sake, even if it does, I believe that any privacy concerns could be resolved by severing certain provisions of the Parental Notification Law.

Moreover the majority and concurrence ignore in practical effect the interests and rights of the State and parents in taking steps to assist a minor who is seeking an abortion in receiving information and counseling concerning all aspects of that decision. The United States Supreme Court has clearly explained that the State has a legitimate right to enact laws designed to encourage a woman contemplating abortion to be informed regarding the effects that abortion may have on her and regarding alternatives to abortion. In *Planned Parenthood v. Casey*, Justice Sandra Day O'Connor wrote for the Court and stated:

> [I]t must be remembered that *Roe v. Wade* speaks with clarity in establishing not only the woman's liberty but also the State's "important and legitimate interest in potential life." That portion of the decision in *Roe* has been given too little acknowledgment and implementation by the Court in its subsequent cases. Those cases decided that any regulation touching upon the abortion decision must survive strict scrutiny, to be sustained only if drawn in narrow terms to further a compelling state interest. Not all of the cases

---

[1]    *State v. Planned Parenthood of Alaska*, 171 P.3d 577 (Alaska 2007) (*Planned Parenthood II*).

-65-                                                                          **7114**

decided under that formulation can be reconciled with the holding in *Roe* itself that the State has legitimate interests in the health of the woman and in protecting the potential life within her.

> . . . .

> Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself.[2]

In the case before us, the Alaska Legislature enacted a law after Alaska citizens passed the Parental Notification Act initiative[3] requiring that parents be notified if their minor daughter is seeking an abortion, with exceptions discussed below. One obvious purpose of this law is to provide the minor's parents the opportunity to discuss with their daughter the potential effects of and alternatives to abortion. This is beyond doubt a legitimate interest and right that the State and the parents possess. Contrary to the Supreme Court's clear statement in this regard, the Alaska Court today trivializes and makes this right of no effect.

---

  **2**    *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 871-72 (1992) (internal citations omitted).

  **3**    AS 18.16.010-.040; Alaska Laws Initiative Meas. 2 (Bal. Meas. 2), 26th Leg., 2d Sess. (2010). *See also Planned Parenthood of Alaska v. Campbell*, 232 P.3d 725, 727 (Alaska 2010) (discussing the initiative's procedural history).

## I.    INTRODUCTION

> [T]he right to the care and custody of one's own child is a fundamental right recognized by both the federal and state constitutions. This right is one of the most basic of all civil liberties.[4]

This appeal raises questions about the Parental Notification Law through the lens of minors' equal protection and privacy rights, but it also raises questions about parents' fundamental rights to be informed that their minor daughter is seeking an abortion *and* parents' rights to discuss this potentially life-changing decision with their daughter before she undergoes this procedure.[5] In 1997 the Alaska Legislature enacted a law that provided that minors could not obtain abortions without their parents' *consent*, subject to certain exceptions.[6] Planned Parenthood challenged this Alaska Parental

---

[4]    *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1227-28 (Alaska 2008) (citations omitted). I acknowledge that this quote is frequently found in the context of court decisions concerning the termination of parental rights. But it seems reasonable to conclude that parents' fundamental rights to provide care for their children include the right to know that their minor daughter is planning to obtain an abortion and the right to counsel their daughter concerning the "philosophic and social arguments of great weight" recognized by the Supreme Court in *Planned Parenthood v. Casey*, quoted above.

[5]    The majority argues that the issue before this court has nothing to do with parents' constitutional rights to parent their children and that this case instead involves only the questions of whether the Notification Law violates minors' equal protection or privacy rights. In my view, this case is more about the rights of parents to be informed about and involved in their daughter's decision to have an abortion than anything else. Nevertheless, the legal analysis in this dissent responds to the court's majority and concurring opinions that rest upon equal protection and privacy grounds and conclude that the Parental Notification Law does not violate either equal protection or the right to privacy.

[6]    Ch. 14, §§ 1-10, SLA 1997.

Consent Act, arguing that it violated the minors' rights to privacy and equal protection.[7] In a 3-2 decision, the Alaska Supreme Court agreed with Planned Parenthood that the Parental Consent Act violated the minors' rights to privacy and decided that it did not need to reach the equal protection challenge.[8] But notably, the court majority gave its repeated, unambiguous blessing to a law upholding parents' rights to be *notified* that their minor daughter is seeking an abortion:

> We decide today that the State has an undeniably compelling interest in protecting the health of minors and in fostering family involvement in a minor's decisions regarding her pregnancy . . . . [*W*]*e determine that the constitution permits a statutory scheme which ensures that parents are notified* so that they can be engaged in their daughters' important decisions in these matters.[9]

The court explained its rationale why a parental notification statute, as opposed to a parental consent statute, is constitutionally permissible:

> *There exists a less burdensome and widely used means of actively involving parents in their minor children's abortion decisions: parental notification.* The United States Supreme Court has recognized, in a different context, that "notice statutes are not equivalent to consent statutes because they do not give anyone a veto power over a minor's abortion

---

[7]     *Planned Parenthood II*, 171 P.3d 577, 580 (Alaska 2007).

[8]     *Id*. at 581 n.21, 585.  In my view, the dissenting opinion in *Planned Parenthood II*, authored by Justice Carpeneti and joined in by Justice Matthews, is a far more compelling resolution of the privacy argument raised in that case. *See id*. at 585-98 (Carpeneti, J., dissenting).  I can only echo Justice Carpeneti's remarks in *Planned Parenthood II*, which I find equally applicable to this appeal:  "Because this court's rejection of the legislature's thoughtful balance is inconsistent with our own case law and unnecessarily dismissive of the legislature's role in expressing the will of the people, I respectfully dissent." *Id*. at 585.

[9]     *Id*. at 579 (emphasis added) (majority opinion).

decision." And many states currently employ this less restrictive approach. Because the State has failed to establish that the greater intrusiveness of a statutory scheme that requires parental consent, rather than parental notification, is necessary to achieve its compelling interests, the Parental Consent Act does not represent the least restrictive means of achieving the State's interests and therefore cannot be sustained.[10]

The court concluded by again lauding the benefits of a parental notification statute in language that, given today's decision, can only be regarded as ironic:

> These expressed legislative goals — increased parental communication, involvement, and protection — are no less likely to accompany parental notification than the parental "veto power" [over a minor's decision to have an abortion].
> . . . .
>
> Notification statutes protect minors by enhancing the potential for parental consultation concerning a [minor's] decision. In fact, to the extent that parents who do not have a "veto power" over their minor children's abortion decision have a greater incentive to engage in a constructive and ongoing conversation with their minor children about the important medical, philosophical, and moral issues surrounding abortion, a *notification requirement may actually better serve the State's compelling interests*.[11]

In reasonable reliance on the court's approval of parents' rights to be notified of their daughters' intent to have an abortion, the Alaska Legislature enacted the Parental Notification Law in accordance with a voter initiative passed by Alaska

---

[10]     *Id*. (quoting *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 511 (1990)) (emphasis added).

[11]     *Id*. at 585 (second alteration in original) (emphasis added) (citations omitted).

citizens.[12] Planned Parenthood again challenged this law, arguing that it violated the minors' rights to privacy and equal protection. The superior court, mindful of the supreme court's unqualified approval of a law recognizing parents' rights to be notified that their minor daughter is seeking an abortion, held that the Parental Notification Law did not violate minors' rights to equal protection. Superior Court Judge John Suddock cogently explained:

> It is hard to fathom the Alaska Supreme Court overturning the [Parental Notification Law] on equal protection grounds notwithstanding *Planned Parenthood II*'s privacy-clause affirmance . . . . When a minor decides to opt out of pregnancy, she is no longer similarly situated with other pregnant minors with respect to the familial consultation issue. Accordingly, this court holds that the [Parental Notification Law] does not violate Alaska's equal protection clause.

But today a majority of the supreme court inexplicably walks back on its broad pronouncements in *Planned Parenthood II* and holds that the Parental Notification Law unconstitutionally violates pregnant minors' rights to equal protection. The majority does so by the expedient of finding that pregnant minors who seek abortions are similarly situated to minors who wish to carry their pregnancies to term — an untenable conclusion. The determination that two groups are similarly situated is a finding of

---

[12] AS 18.16.010-.040; Alaska Laws Initiative Meas. 2 (Bal. Meas. 2), 26th Leg., 2d Sess. (2010). *See also Planned Parenthood of Alaska v. Campbell*, 232 P.3d 725, 727 (Alaska 2010) (discussing the initiative's procedural history).

fact,[13] subject to reversal by an appellate court only if the trial court that made that factual finding clearly erred.[14]

---

[13] The majority today does not agree that whether two groups are similarly situated is a question of fact. The majority acknowledges that this court has held in a unanimous decision as recently as two years ago that "[w]hether two entities are similarly situated is generally a question of fact." *State v. Schmidt*, 323 P.3d, 647, 655 (Alaska 2014). But today, being confronted with this inconvenient holding, the majority now claims that this statement "may have created some ambiguity about the standard of review for 'similarly situated' when examining an equal protection challenge under the 'shorthand analysis' — is it a question of fact or is it a mixed question of fact and law?" Opinion at 26. The majority rationalizes that "rather than resolving the 'similarly situated' issue purely as a factual matter" in *Schmidt*, "we considered the superior court's factual findings . . . and held as a matter of law that same-sex couples who would marry if allowed to do so were . . . similarly situated to married couples." Opinion at 26 n.82. But the majority also claims that "[w]e do not need to address that question [raised by *Schmidt* regarding the 'similarly situated' standard of review] here" because we are not using a shorthand analysis. Opinion at 26-27.

The standard of review can be critical to the outcome of a case. If the issue presented concerns a factual finding by the trial court, this court will review that finding under a very deferential clear error standard: only if the trial court's finding is clearly erroneous will we reverse that finding. *Planned Parenthood II*, 171 P.3d at 581. But if the issue presented involves a question of law, this court will be free to substitute its own judgment for that of the trial court. This court reviews such questions de novo, adopting the rule of law "in light of precedent, reason, and policy." *Id.*

It is ironic, at the least, that the majority today must disavow precedent even with respect to the standard of review in order to also disavow its approval of a parental notification law repeatedly championed in *Planned Parenthood II*. The law on the standard of review had been settled and is straightforward: whether the two groups are similarly situated has been traditionally understood to be a question of fact. Now the majority unjustifiably uses its "independent judgment" to "clarify" the law to avoid applying the clearly erroneous standard of review to the superior court's factual finding that minors seeking abortions are not similarly situated to minors who want to carry their pregnancies to term.

[14] *Schmidt*, 323 P.3d at 655 (" 'Whether two entities are similarly situated is (continued...)

In this case the superior court found, reasonably, that minors who seek abortions are *not* similarly situated to minors who want to carry their pregnancies to term. This determination, with which the concurrence agrees, is self-evident. What similarity can there be between a decision to terminate life and a decision to preserve life? Yet the majority concludes, erroneously and in sweeping language, that "vindicating the State's compelling interest in encouraging parental involvement in minors' pregnancy-related decisions does not support the Notification Law's disparate treatment of the two [similar] classes of pregnant minors," that is to say, minors who wish to abort their pregnancies and minors who wish to carry their pregnancies to term.

This court has previously proclaimed that "it is the right and duty, privilege and burden, of all parents to involve themselves in their children's lives; to provide their children with emotional, physical, and material support; and to instill in their children 'moral standards, religious beliefs, and elements of good citizenship.' "[15] The Parental Notification Law focuses on the State's interest in "aiding parents in fulfilling their parental responsibilities"[16] by upholding the parents' rights to be notified of a significant medical decision involving their minor daughter, and to at least have the opportunity to counsel their child regarding this important decision and its lasting consequences. The court's decision today totally undermines the parents' rights and responsibilities in this regard and makes a mockery of its earlier proclamations of the proper and fundamental role parents have traditionally played in their children's lives.

---

[14]    (...continued)
generally a question of fact,' reviewed for clear error." (citing *Alaska Inter-Tribal Council v. State*, 110 P.3d 947, 967 (Alaska 2005))).

[15]    *Planned Parenthood II*, 171 P.3d at 583 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972)).

[16]    *Id.* at 582.

Under its ruling today, *no* parental notification law recognizing parents' fundamental legal rights to notification of, much less meaningful involvement in, their minor daughters' decisions to have abortions will be upheld by this court under its strained jurisprudence defining minors' rights to equal protection. And notwithstanding its broad approval in *Planned Parenthood II* of a parental notification law being an acceptable lesser restrictive alternative to a parental consent law, the concurrence's opinion today that the Parental Notification Law violates a minor's right to privacy suggests that this court will always find a lesser restrictive alternative that will defeat the legislature's effort to craft a constitutional parental notification law.

I cannot see how the court can reach these results under our standard of review for constitutional questions: "adopting the most persuasive rule of law in light of precedent, reason, and policy."[17] I have explained above why the Parental Notification Law does not violate equal protection: the two classes of minors are not similarly situated. Given the critical balance between a woman's right to decide to have an abortion, the State's legitimate and compelling interests in the health of the minor who is seeking an abortion, and the parents' fundamental rights to be informed of and involved in their minor daughter's decision making, I conclude that so long as there is an effective, reasonably simple way for a sufficiently mature minor to bypass the parental notification requirements under the statute, our precedent, reason, and policy compel upholding the Parental Notification Law as a legitimate exercise of the people's power to initiate law and of legislative power to enact law. In the balance, a mature minor's right to privacy, whatever its contours, is protected by the judicial bypass mechanism contained in the statute; an immature minor's right to privacy, if any, is not so protected nor should it be — because she is immature.

---

[17] *Id*. at 581.

## II. THE PARENTAL NOTIFICATION LAW DOES NOT IN PRACTICE INHIBIT A MATURE MINOR'S RIGHT TO OBTAIN AN ABORTION.

The Parental Notification Law does not require a minor to obtain parental consent for an abortion. Furthermore, it neither bars a minor from obtaining an abortion nor presents significant hurdles for a minor seeking an abortion. Instead, the Parental Notification Law requires that one of the minor's parents receive 48 hours' notice before the abortion occurs. And this requirement is not absolute; the law includes a constitutionally necessary exception to protect the minor's life[18] as well as a judicial bypass mechanism.[19] This judicial bypass mechanism is available to minors who can demonstrate "that one or both of the minor's parents or the minor's guardian or custodian was engaged in physical abuse, sexual abuse, or a pattern of emotional abuse against the minor, *or* that the consent of a parent, guardian, or custodian otherwise is not in the minor's best interest."[20] The bypass is also available to minors who — regardless of the reason — do not wish to have their parents notified and can demonstrate that they are

---

[18]  AS 18.16.010(g) (providing an affirmative defense for failing to notify a minor's parent prior to the abortion when an "immediate threat of serious risk to the life or physical health of the pregnant minor from the continuation of the pregnancy create[s] a medical emergency necessitating the immediate performance or inducement of an abortion"); *Roe v. Wade*, 410 U.S. 113, 163-64 (1973) ("If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, *except when it is necessary to preserve the life or health of the mother*." (emphasis added)).

[19]  See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 899 (1992) ("Our cases establish, and we reaffirm today, that a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, *provided that there is an adequate judicial bypass procedure*." (emphasis added)).

[20]  AS 18.16.030(b)(4)(B) (emphasis added).

"sufficiently mature and well enough informed to decide intelligently whether to have an abortion without notice to . . . a parent, guardian, or custodian."[21]

Even in the absence of abuse, the bypass process presents an almost negligible hurdle to access to an abortion with the inclusion of the "mature and well-informed" language in AS 18.16.030(b)(4)(A). The superior court found that under this broad provision "[i]f an Alaskan minor invokes the sufficient-maturity prong in her bypass petition, her petition will invariably be granted."[22] While filing a petition and appearing in court may seem to be a challenging experience for a minor, it is not difficult for an appropriately mature and well-informed minor to obtain judicial bypass, not only because of the broad scope of the language in AS 18.16.030(b)(4)(A), but also because access and cost are not barriers in either theory or practice.

First, the statute itself ensures that access and cost are not barriers to judicial bypass. The statute explicitly provides that an attorney will be appointed if the minor does not retain one of her own[23] and that there is no cost to obtain the necessary forms, file these forms, or appear in court.[24] The statute also provides that the minor must be informed that she may request a telephonic hearing to avoid an in-person hearing and that the court may excuse a minor from school to participate in her hearing.[25]

---

[21] AS 18.16.030(b)(4)(A).

[22] During the 14 months that this Parental Notification Law was in effect, 9 minors filed bypass petitions. Of those petitions, 8 were granted and 1 was withdrawn. The superior court also noted that studies from Minnesota and Massachusetts indicated their rates of denied petitions to be 0.25% and 0.013%, respectively.

[23] AS 18.16.030(d).

[24] AS 18.16.030(*l*), (m).

[25] AS 18.16.030(n).

Second, access and cost are not barriers to judicial bypass in practice. The bypass petition instructions list a toll-free number through which the minor can speak to a magistrate judge, who may appoint counsel and help direct the minor to the correct court. Minors may file their bypass petitions via email, fax, mail, or in person. An Alaska attorney who handled judicial bypass petitions testified in the superior court that she was able to prepare minors for these hearings by phone and that one of the minors she represented successfully appeared at the hearing telephonically. She indicated that all of the petitions she worked on were successful; that she "receives notice from the court system within an hour or two of a petition's lodging"; that all of her conferences with the minors occurred within 24 hours of the initial contact; and that all of her bypass hearings were held within 48 hours of the filing of the petition.

Thus, the Parental Notification Law includes an easily navigable, broad bypass process, which ensures that the Notification Law does not stand in the way of a minor's access to abortion. However, even though all petitions under the Parental Notification Law have been granted so far, this law is necessary for the State to ensure that in those cases where a minor does not petition to bypass parental notification, the people society holds responsible for her well-being — her parents — will be informed of what is happening in her life.

## III.   EQUAL PROTECTION

### A.      Our Departure From *Planned Parenthood II*

In *Planned Parenthood II*, this court decided "that the State has an undeniably compelling interest in protecting the health of minors and in fostering family involvement in a minor's decisions regarding her pregnancy."[26] The court concluded, however, that the Parental Consent Act burdened a minor's fundamental right to

---

[26]   *Planned Parenthood II*, 171 P.3d 577, 579 (Alaska 2007).

privacy[27] and that even though the State's interests in "protecting minors from their own immaturity and aiding parents in fulfilling their parental responsibilities" were compelling,[28] the Parental Consent Act could not stand because it failed to use the least restrictive means available to advance the State's compelling interests.[29]

While this court held that the Parental Consent Act improperly balanced the minor's right to privacy and these compelling government interests, the court also endorsed "a statutory scheme which ensures that parents are notified so that they can be engaged in their daughters' important decisions in these matters."[30] More specifically, this court held that "[t]here exists a less burdensome and widely used means of actively involving parents in their minor children's abortion decisions: parental notification."[31] The court identified the option of parental notification as a constitutionally acceptable lesser restrictive means of achieving the State's compelling interests; the court claimed that "[b]ecause the State has failed to establish that the greater intrusiveness of a statutory scheme that requires parental consent, rather than parental notification, is necessary to achieve its compelling interests, the Parental Consent Act does not represent the least restrictive means of achieving the State's interests and therefore cannot be sustained."[32] That last holding was based on the idea that the legislature could have achieved the same

---

[27]     *Id.* at 581-82.

[28]     *Id.* at 582.

[29]     *Id.* at 583-85.

[30]     *Id*. at 579.

[31]     *Id*.

[32]     *Id*.

goals through less restrictive means:  namely, a parental notification law.[33]  This was an explicit endorsement of parental notification.  By striking down the Parental Notification Law, today's decision departs — without any compelling reason — from the court's decision and rationale in *Planned Parenthood II*.

Today's majority opinion recognizes this inconsistency and claims that *Planned Parenthood II* did not "mean that every conceivable notification law will satisfy the separate and independent constitutional equal protection standard."[34]  The opinion goes on to proclaim that "the Notification Law stands or falls on its own specific terms and stated justifications."[35]  And its reasoning suggests that the legislature could amend the Parental Notification Law or make further findings that might make a parental notification statute constitutional under Alaska law.

But the majority's equal protection analysis does not rely on or even mention the specific terms and shortcomings of *this* parental notification statute.[36]  Instead, it focuses on the fact that the statute requires notification when minors choose to abort but not when they choose to carry to term.  Most instructive is the following statement:

> We must conclude that the State's asserted interests do not justify a distinction between pregnant minors seeking to terminate and those seeking to carry to term. . . .   The

---

[33]    *Id.*

[34]    Opinion at 17-18.

[35]    Opinion at 20.

[36]    Had there been something specific to this notification law that rendered it unconstitutional the majority's analysis would be expected to look similar to the concurrence's analysis of the privacy issue.  That it does not is telling.  Instead, the majority engages in an unconvincing equal protection analysis, ultimately grounded on a false similarity between two distinct classes of pregnant minors.

Notification Law's discriminatory barrier to those minors seeking to exercise their fundamental privacy right to terminate a pregnancy violates Alaska's equal protection guarantee.[37]

But a law requiring parental notification of a minor's abortion *necessarily* differentiates between minors seeking an abortion and minors who intend to carry to term. This is because Alaska minors who intend to carry to term are able to consent to pregnancy-related care without parental notification or consent.[38] The legislature could have required parental notification for any pregnancy-related treatment of a minor. But the parties agreed in the superior court that "no useful purpose is served by withdrawing medical emancipation and requiring parental consultation for carry-to-term decisions." And the superior court found that medical emancipation for carry-to-term decisions encouraged minors "to obtain prenatal care [that] advances important interests in maternal and fetal health." This is all the more important in light of the superior court's findings regarding the serious health risks pregnant minors face when carrying to term.

Furthermore, the majority of states whose laws we cited in *Planned Parenthood II* make a similar distinction.[39]

---

[37]    Opinion at 37.

[38]    AS 25.20.025(a)(4).

[39]    *Planned Parenthood II*, 171 P.3d 577, 583 (Alaska 2007) ("Although the precise details of [the parental notification statutes cited in note 40 of *Planned Parenthood II*] vary, *they all prohibit minors from terminating a pregnancy until their parents have been notified* and afforded an appropriate period of time to actively involve themselves in their minor children's decision-making processes." (emphasis added)). The following list sets forth the status of this distinction in the states we cited in *Planned Parenthood II*, note 40: COLO. REV. STAT. §§ 12-37.5-101 to -108 (requiring parental notification), § 13-22-103.5 (providing medical emancipation for care related to an intended live birth); DEL. CODE ANN. tit. 13, § 710 (providing medical emancipation for,

(continued...)

Instead of explaining what portion of AS 18.16.030 justifies departing from the court's unqualified approval of parental notification in *Planned Parenthood II*,

---

**39** (...continued)

*inter alia*, pregnancy-related care other than abortion to minors age 12 and older), tit. 24, §§ 1780-1789B (requiring parental notification); FLA. STAT. § 390.01114 (requiring parental notification), § 743.065(a) (providing medical emancipation for a minor for pregnancy-related care); GA. CODE ANN. §§ 15-11-680 to -688 (requiring parental notification), § 31-9-2(a)(5) (providing every woman with the ability to consent to medical treatment when related to her pregnancy), § 31-9-5 (specifically excluding abortion and sterilization from § 31-9-2); 410 ILL. COMP. STAT. 210/1 (granting a pregnant minor the same capacity to act as a person of legal age with respect to medical consent), 750 ILL. COMP. STAT. 70 (requiring parental notification); MD. CODE ANN., HEALTH-GEN. § 20-102(c)(4) (permitting a minor to consent to pregnancy-related treatment), § 20-103 (requiring parental notification); MINN. STAT. § 144.343(1) (permitting a minor to consent to pregnancy-related treatment), § 144.343(2) (requiring parental notice of abortion); MONT. CODE ANN. § 41-1-402(2)(c) (emancipation provision) §§ 50-20-501 to -511 (requiring parental consent). Montana enacted a notice law in 2011 and a consent law in 2013. The 2013 consent statute replaced the 2011 notification statute, but the 2013 statute was enjoined, so the 2011 statute remains in effect. *Planned Parenthood of Mont. v. State*, 342 P.3d 684, 687 n.2 (Mont. 2015). Kansas allows a minor to consent to pregnancy-related care when no parent or guardian is available. KAN. STAT. ANN. § 38-123 (allowing a pregnant minor to consent to pregnancy-related care "where no parent or guardian is available"), §§ 65-6704 to -6705 (requiring parental consent for minor's abortion). Iowa, Nevada, South Dakota, and West Virginia do not have medical emancipation laws allowing minors to consent to pregnancy-related medical care, but they do have parental notification laws. IOWA CODE § 135L.3; NEV. REV. STAT. 442.255 (Nevada's parental notification statute is permanently enjoined. *Glick v. McKay*, 937 F.2d 434 (9th Cir. 1991) (preliminary injunction upheld); No. CV-N-85-331-ECR (D. Nev. Oct. 10, 1991) (permanent injunction issued)); S.D. CODIFIED LAWS § 34-23A-7; W. VA. CODE §§ 16-2F-1 to -9. New Jersey has a medical emancipation law, but the state's parental notification law was declared unconstitutional. N.J. STAT. ANN. § 9:17A-1 (emancipation provision), §§ 9:17A-1.1 to -1.12 (requiring parental notification) *declared unconstitutional under state constitution in Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 622 (N.J. 2000). Nebraska now requires parental consent. NEB. REV. STAT. §§ 71-6901 to -6908.

today's opinion suggests that there is something wrong with *this* notification statute and that some other notification statute might survive an equal protection challenge. But it is difficult to see how any parental notification law could survive unless there are significant changes to Alaska's medical emancipation laws, such that minors intending to carry to term are subject to parental notification as well. Neither party endorses such changes.

### B. The Two Groups Are Not Similarly Situated.

The Alaska Constitution provides equal protection only among those who are similarly situated.[40] If the groups being compared are similarly situated "we apply a sliding scale of scrutiny to the challenged practice."[41] "[W]e first determine the importance of the constitutional right . . . . We then examine the [S]tate's interests . . . . Finally, we consider the means the [S]tate uses to advance its interests."[42]

The majority concedes that there is a "factual difference between the two classes of pregnant minors." However, the majority concludes that "the State's asserted interests do not justify a distinction between pregnant minors seeking to terminate and those seeking to carry to term."

As explained in the Introduction, the Parental Notification Law does not violate Alaska's guarantee of equal protection because the two groups are not similarly situated. I agree with the reasoning set forth in the superior court's decision on this matter, with which the concurrence also agrees.

---

[40] *Shepherd v. State, Dep't of Fish & Game*, 897 P.2d 33, 44 (Alaska 1995) ("The Equal Rights and Opportunities Clause of the Alaska Constitution requires equal treatment *only for those who are similarly situated*." (emphasis added)).

[41] *Alaska Inter-Tribal Council v. State*, 110 P.3d 947, 966-67 (Alaska 2005).

[42] *Id.* at 967 (footnotes omitted).

## C.    A Review Of Other States' Notification And Consent Laws

Today's opinion is also a significant departure from the majority approach throughout the United States regarding parental rights to notice of or consent to their daughter's abortion.[43]   A majority of states have enacted parental notice[44] or parental

---

[43]    *Contra* Opinion at 38 ("Our decision today is not novel.").

[44]    Twelve other states have active parental notification laws.  COLO. REV. STAT. §§ 12-37.5-101 to -108; DEL. CODE ANN. tit. 24, §§ 1780-1789B; FLA. STAT. § 390.01114; GA. CODE ANN. §§ 15-11-680 to -688; 750 ILL. COMP. STAT. 70; IOWA CODE §§ 135L.1 to L.8; MD. CODE ANN., HEALTH-GEN. § 20-103; MINN. STAT. § 144.343; N.H. REV. STAT. ANN. §§ 132:32-36; S.D. CODIFIED LAWS § 34-23A-7; W. VA. CODE §§ 16-2F-1 to -9; *Planned Parenthood of Mont. v. State*, 342 P.3d 684, 687 n.2 (Mont. 2015) (indicating parental consent law is currently enjoined, but parental notice law is in effect).

consent[45] laws that are currently in effect.[46] The Supreme Court of the United States has held that a law requiring parental notification is not unconstitutional under federal law.[47] Several of these state laws have been challenged and declared constitutional under their respective state constitutions,[48] including some that have survived equal protection

---

[45] Twenty-six states have active parental consent statutes. ALA. CODE §§ 26-21-1 to -8; ARIZ. REV. STAT. ANN. § 36-2152; ARK. CODE ANN. § 20-16-801 to -810; IDAHO CODE ANN. § 18-609A (as amended by 2015 IDAHO SESS. LAWS 141); IND. CODE § 16-34-2-4; KAN. STAT. ANN. § 65-6705; KY. REV. STAT. ANN. § 311.732; LA. REV. STAT. ANN. § 40:1299.35.5; MASS. GEN. LAWS. ch. 112, § 12S; MICH. COMP. LAWS §§ 722.901-.908; MISS. CODE ANN. §§ 41-41-51 to -63; MO. REV. STAT. § 188.028; NEB. REV. STAT. §§ 71-6901 to -6911; N.C. GEN. STAT. §§ 90-21.6 to .10; N.D. CENT. CODE § 14-02.1 to -03.1; OHIO REV. CODE ANN. § 2919.121 *unconstitutional provisions severed in Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 364 (6th Cir. 2006); OKLA. STAT. tit. 63, §§ 1-740.1 to .6; 18 PA. CONS. STAT. ANN. § 3206; R.I. GEN. LAWS § 23-4.7-6; S.C. CODE ANN. § 44-41-31; TENN. CODE ANN. 37-10-301 to -308; TEX. OCC. CODE ANN. § 164.052(a)(19); UTAH CODE ANN. § 76-7-304.5; VA. CODE ANN. § 16.1-241(W) (creating a process whereby a minor may petition a court for the ability to consent to an abortion), § 54.1-2969(J) (excluding abortion from a list of procedures to which a minor may independently consent unless the minor complies with § 16.1-241); WIS. STAT. § 48.375; WYO. STAT. ANN. § 35-6-118. *But see* CAL. HEALTH & SAFETY CODE § 123450 (requiring parental consent) *invalidated under state constitution in Am. Acad. of Pediatrics v. Lungren*, 940 P.2d 797, 800 (Cal. 1997).

[46] The majority argues that I cite these jurisdictions without "[r]elevant inquiries about each jurisdiction's laws." Opinion at 39. But in *Planned Parenthood II* the dissent cited these jurisdictions for similar propositions, and I believe it is fair to cite them for similar purposes here. *Planned Parenthood II*, 171 P.3d 577, 596 (Alaska 2007) (Carpeneti, J., dissenting).

[47] *H.L. v. Matheson*, 450 U.S. 398, 409 (1981) (citing *Bellotti v. Baird*, 443 U.S. 622, 640, 649 (1979)).

[48] *Ex parte Anonymous*, 531 So. 2d 901, 905 (Ala. 1988); *Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 186 (Ariz. App. 2011); *Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745,

(continued...)

challenges.[49] Only one state upholding parental notification or consent in the face of an equal protection challenge has equal protection language so different from our own that it would impact the analysis in this dissent.[50]

Having previously stricken the Parental Consent Act and now holding the Parental Notification Law unconstitutional places Alaska out of the mainstream of

---

[48]  (...continued) 765-69 (Ill. 2013); *In re Doe*, 407 So. 2d 1190 (La. 1981) (per curiam); *Planned Parenthood League of Mass., Inc. v. Att'y Gen.*, 677 N.E.2d 101, 106 n.10 (Mass. 1997); *Pro-Choice Miss. v. Fordice*, 716 So. 2d 645, 656-60 (Miss. 1998); *cf. Planned Parenthood of Kan. v. Nixon*, 220 S.W.3d 732 (Mo. 2007) (upholding related statute providing civil penalties against providers of abortions who assist minors without parental consent or judicial bypass of the consent requirement).  Arkansas's statute also seems likely to survive constitutional challenges because that state applies the federal constitutional analysis.  *See* ARK. CONST. amend. 68, § 2 ("The policy of Arkansas is to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution.").

[49]  *Planned Parenthood Ariz., Inc.*, 257 P.3d at 186; *Hope Clinic for Women, Ltd.*, 991 N.E.2d at 765-69; *Planned Parenthood League of Mass., Inc.*, 677 N.E.2d at 106 n.10 (generally affirming parental consent statute in face of equal protection challenge); *Pro-Choice Miss.*, 716 So. 2d at 656-60.

[50]  *Compare* Alaska Const. Art. 1, § 1 ("This constitution is dedicated to the principle[] . . . that all persons are equal and entitled to equal rights, opportunities, and protection under the law . . . ."), *with* ARIZ. CONST. art. 2, § 13 ("No law shall be enacted granting to any citizen . . . privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."); ILL. CONST. art. 1, § 2 ("No person shall be . . . denied the equal protection of the laws."); MASS. CONST. art. 1 ("All people are born free and equal . . . .  Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin.").  Mississippi's constitution does not contain specific equal protection language. *See generally* MISS. CONST.; *Pro-Choice Mississippi v. Fordice*, 716 So. 2d 645 (Miss. 1998).

accepted limits on the right to privacy and equal protection[51] and shows a marked disrespect to the people's and the legislature's expression of the State's interests in both the health and well-being of its minor citizens and the minors' parents' rights to be informed and involved in their daughters' decision making.

## IV. THE RIGHT TO PRIVACY

While I agree with that part of the concurrence's equal protection discussion concluding that the two classes of pregnant minors are not similarly situated, I disagree with the concurrence's conclusion that the Parental Notification Law violates the Alaska Constitution's Privacy Clause. The plain language of the Privacy Clause does not address this question, nor is there any suggestion in the history of the constitutional amendment creating the right to privacy in Alaska that the amendment was intended to overturn parents' rights to be informed that their minor daughters were intending to obtain abortions.[52] As explained above, in *Planned Parenthood II* this court determined — correctly — that the State's interests in "protecting minors from their own immaturity and aiding parents in fulfilling their parental responsibilities" are compelling.[53] It is only a misapplication of the "strict scrutiny/narrow tailoring of

---

[51] *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 871-72 (1992).

[52] *See Gray v. State*, 525 P.2d 524, 528 (Alaska 1974) ("In 1972 Alaska amended its constitution expressly providing that, 'The right of the people to privacy is recognized and shall not be infringed.' *There is no available recorded history of this amendment . . . .* But the right of privacy is not absolute. Where a compelling state interest is shown, the right may be held to be subordinate to express constitutional powers such as the authorization of the legislature to promote and protect public health and provide for the general welfare." (emphasis added) (internal citations omitted)).

[53] *Planned Parenthood II*, 171 P.3d 577, 582 (Alaska 2007).

means-to-end test" that justifies a conclusion that the Parental Notification Act violates the Privacy Clause. This defies reason and common sense.[54]

I disagree with the concurrence's statement that the Parental Notification Law "does not achieve its goals using the least restrictive means."[55] Whether a method is the least restrictive means of achieving the State's compelling interests is in the eye of the beholder. What one judge or policymaker considers to be the least restrictive means of achieving a given goal may not seem to be the least restrictive means to another judge or policymaker. Based on their individual experiences, how they weigh the given evidence, and their personal values, whether one policy is less restrictive than another typically comes down to a value judgment.

The Alaska Supreme Court's persistent use of an ever-narrowing means-to-end test in these parental consent and notification cases demonstrates that when the test passes the limits of reason and common sense, the test loses whatever legitimacy it (may have) once possessed. The quest to discover "lesser restrictive means" to achieve the State's compelling interests at some point becomes self-fulfilling — there can always be found some lesser alternative that might have been employed, and thus every legislative enactment touching upon abortion can be held unconstitutional — whether

---

[54]     *Cf. Planned Parenthood of Southeastern Pa.*, 505 U.S. at 871 ("*Roe v. Wade* speaks with clarity in establishing not only the woman's liberty but also the State's 'important and legitimate interest in potential life.' That portion of the decision in *Roe* has been given too little acknowledgment and implementation by the Court in its subsequent cases. Those cases decided that any regulation touching upon the abortion decision must survive strict scrutiny, to be sustained only if drawn in narrow terms to further a compelling state interest. Not all of the cases decided under that formulation can be reconciled with the holding in *Roe* itself that the State has legitimate interests in the health of the woman *and* in protecting the potential life within her." (emphasis added) (internal citations omitted)).

[55]     Concurring Opinion at 44.

under the rubric of right to privacy or equal protection. The court's "lesser restrictive alternative" analysis today reminds me of Zeno's paradox of the race between the Tortoise and Achilles (purporting to prove that the faster runner can never win the race because, when one artificially divides the distance of the racecourse in half, then again in half, and again and again ad infinitum, the runner can never cross the finish line because there will always be some small incremental half-distance remaining).

In my view, once it is understood that the Parental Notification Law contains an effective, reasonably simple judicial bypass mechanism that will permit sufficiently mature minors to bypass parental notification,[56] and provides for bypass if there is evidence of parental abuse,[57] then the court should respect the people's and the legislature's policy decisions and line drawing with respect to the remaining details of the Notification Law. For example, the concurrence finds it objectionable that the legislature drew a line at age 16 in the Parental Consent Act[58] but drew the line at age 18 in the Parental Notification Act.[59] I do not find this difference to be of constitutional magnitude. Though a minor aged 16 to 17 is brought within the Notification Act, if she is sufficiently mature, or if there is evidence of parental abuse, then she will be able to bypass parental notification. I find this entirely reasonable and do not think it is the court's constitutional responsibility or prerogative to second guess this legislative policy call.

Finally, assuming for the sake of argument that the Parental Notification Law as written does violate the Privacy Clause, I also cannot join in the concurrence's

---

[56] AS 18.16.030(b)(4)(A).

[57] AS 18.16.030(b)(4)(B).

[58] *See Planned Parenthood II*, 171 P.3d at 583.

[59] AS 18.16.010(a)(3).

conclusion that the Notification Law cannot be modified to comply with the Alaska Constitution's privacy guarantee by severing certain provisions.

Even if the legislature does not explicitly include a severability clause in legislation, Alaska courts interpret legislation as though it includes a severability clause under AS 01.10.030.[60] "We have consistently severed laws rather than invalidating them when construing this general severability clause [in AS 01.10.030]."[61]

This court determines severability using a two-part test. "A provision will not be deemed severable 'unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.'"[62] "The key question is whether the portion remaining, once the offending portion of the statute is severed, is independent and complete in itself so that it may be presumed that the legislature would have enacted the valid parts without the invalid part."[63]

The concurrence identifies three major issues as being overbroad in addition to those that the superior court has already enjoined that are not on appeal. First, the concurrence states that the clear and convincing evidence standard of proof that the Parental Notification Law requires a minor to meet before she may bypass the

---

[60] AS 01.10.030 ("Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language: 'If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of this Act and the application to other persons or circumstances shall not be affected thereby.'").

[61] *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 214 (Alaska 2007).

[62] *Lynden Transp., Inc. v. State*, 532 P.2d 700, 713 (Alaska 1975) (quoting *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924)).

[63] *Sonneman v. Hickel*, 836 P.2d 936, 941 (Alaska 1992).

Notification Law is one of the strictest in the country.  Second, the concurrence suggests that the heavy burden the Notification Law places on physicians and families is overbroad compared to similar laws in other jurisdictions.  The concurrence notes that a parent or guardian must show government identification and proof of their relationship to the minor before receiving notice.  The concurrence also argues that the Parental Notification Law places physicians under a heavy burden, as they are required to both verify that the phone number they use to provide notice is that of the parent or guardian and to ask questions to verify the identity of the parent or guardian once the physician reaches them.  Finally, the concurrence suggests that the Parental Notification Law is too expansive in scope because it applies to minors over the age of sixteen, while *Planned Parenthood II* only considered a notification law applicable to minors aged sixteen and younger.

I disagree with the concurrence's conclusions that this law "does not demonstrate a serious effort at narrow tailoring" and that these aspects of the Parental Notification Law are overbroad.  As just one example, consider the clear and convincing evidence standard, which requires a minor to make certain showings by clear and convincing evidence before bypassing the Notification Law.  Practically, this standard is no more strict than similar laws in other states.  When a minor seeking a judicial bypass appears before the court alleging she is sufficiently mature to make her own decision, she in all probability will be the only witness present.  Her testimony will be persuasive on the merits or it will not be.  If it is persuasive to the court, it will be found to be clear and convincing; if it is found unpersuasive, the testimony would not meet the preponderance of the evidence standard.

Furthermore, the superior court has already enjoined certain portions of the Parental Notification Law while upholding others.  The superior court enjoined the civil liability portion of the statute as well as the personal-notice-by-physician provision.

**7114**

There is no reason to think that the clear and convincing evidence standard, the provisions that place heavier burdens on physicians and families than similar provisions in other states, and the age provisions of the Notification Law cannot also be severed if they are constitutionally infirm. The provisions that the concurrence questions are no more fundamental to the Parental Notification Law than those enjoined by the superior court. It would be easy to remove the clear and convincing evidence standard, lessen the burdens on families and physicians, and change the age restrictions in the Parental Notification Law should the court find that these portions of the law are indeed overbroad.

If these provisions are severed, the heart of this legislation remains — the requirement that parents of a minor seeking an abortion be notified of their daughter's choice. The other issues the concurrence raises are merely side issues.

The Alaska Legislature and the voters of this state have exerted substantial efforts to pass some form of parental involvement law.[64] I have little difficulty concluding that they would prefer this court save the Parental Notification Law by severing certain non-integral provisions if at all possible, and I believe we could do so.

## V.    CONCLUSION

For all of these reasons, I dissent from the majority opinion's equal protection analysis and I disagree with the concurring opinion's right to privacy analysis.

---

[64]    *See* ch. 14, SLA 1997; ch. 178, SLA 2004; Ballot Measure No. 2 (Alaska 2010), http://www.elections.alaska.gov/doc/bmp/2010/2010_prim_bmp.pdf.